No. 24-1355

# In the
# United States Court of Appeals
# for the Fourth Circuit

Walmart Real Estate Business Trust, *et al.*,

*Plaintiffs-Appellees and Cross-Appellants*,

v.

Quarterfield Partners LLC, *et al.*,

*Defendants-Appellants and Cross-Appellees*.

On Appeal from the
United States District Court
for the District of Maryland
No. 1:18-cv-03664-TJS
(Hon. Deborah L. Boardman and
Hon. Timothy J. Sullivan)

## Brief of Appellants Quarterfield Partners LLC, *et al.*

John A. Bourgeois
Amy E. Askew
Louis P. Malick
KRAMON & GRAHAM, P.A.
750 East Pratt Street, Suite 1100
Baltimore, Maryland 21202
(410) 752-6030
jbourgeois@kg-law.com
aaskew@kg-law.com
lmalick@kg-law.com

*Counsel for Appellants
Quarterfield Partners LLC, et al.*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1355__        Caption: __Walmart REBT, et al. v. Quarterfield Partners LLC, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__BL Quarterfield Associates LLC__
(name of party/amicus)

_____

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO

2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Louis P. Malick _____     Date: _____ May 8, 2024 _____

Counsel for: BL Quarterfield Associates LLC _____

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1355__     Caption: __Walmart REBT, et al. v. Quarterfield Partners LLC, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Q.O.P. Properties, LLC__
(name of party/amicus)

_____

 who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?                    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                                ☐YES ☑NO
      If yes, identify all such owners:

4.     Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
If yes, identify entity and nature of interest:

5.     Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.     Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.     Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Louis P. Malick                              Date:      May 8, 2024

Counsel for: Q.O.P Properties, LLC

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1355__        Caption: __Walmart REBT, et al. v. Quarterfield Partners LLC, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Quarterfield Office Park, LLC__
(name of party/amicus)

_____

 who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?                ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                        ☐YES ☑NO
      If yes, identify all such owners:

4.      Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?      ☐YES ☑NO
If yes, identify entity and nature of interest:

5.      Is party a trade association? (amici curiae do not complete this question)      ☐YES ☑NO
If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.      Does this case arise out of a bankruptcy proceeding?      ☐YES ☑NO
If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.      Is this a criminal case in which there was an organizational victim?      ☐YES ☑NO
If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Louis P. Malick                           Date: _____May 8, 2024_____

Counsel for: Quarterfield Office Park, LLC_____

- 2 -

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. __24-1355__      Caption: __Walmart REBT, et al. v. Quarterfield Partners LLC, et al.__

Pursuant to FRAP 26.1 and Local Rule 26.1,

__Quarterfield Partners LLC__
(name of party/amicus)

_____

 who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐ YES ☑ NO


2.    Does party/amicus have any parent corporations?                ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?                ☐ YES ☑ NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?  ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)  ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?  ☐ YES ☑ NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?  ☐ YES ☑ NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Louis P. Malick                              Date:      May 8, 2024

Counsel for: Quarterfield Parters LLC

Print to PDF for Filing

# Table of Contents

Corporate Disclosure Statements.............................................................unnumbered

Table of Authorities ......................................................................................... iii

Jurisdictional Statement .......................................................................................1

Issues Presented for Review ................................................................................1

Statement of the Case...........................................................................................2

Summary of the Argument..................................................................................11

Argument.............................................................................................................13

Standards of Review ..........................................................................................13

I.    The district court erred in determining that Section 27 of the Leases granted Walmart and Sam's enforceable and unconditional options to purchase the properties. ...................................................................14

    A. The court ignored the plain language of the agreement by reading two sentences out of Section 27, thereby violating the law of objective contract interpretation. ...............................................16

    B. The court erred again by applying Maryland law governing "true" options, which is different than the law governing the conditional options in the Leases in this case...........................................19

    C. The court erred again by directing its ruling to avoid an interpretation that it believed would create an illusory contract, or that would render other terms superfluous, which was not the case........22

II.   The district court erred in determining that Quarterfield breached the operative lease agreements by not issuing the option notices. ......................26

III.  The district court erred in determining that Walmart and Sam's timely and validly exercised the options to purchase the properties. ......................29

    A. The plain language of Section 27 only allows for one permissible meaning: that the "eleventh year" of "this Lease" should be determined running from the beginning of the Lease, not the beginning of some later period. ...............................................30

    B. Although the court should not have considered extrinsic evidence, it further erred in ruling as a matter of law in favor of Walmart and Sam's on that extrinsic evidence............................................34

IV.     The district court erred in its formulation of a damages award that takes no account for the fact that Walmart and Sam's were permitted to delay payment of the purchase price for the properties during the more than five years after they purportedly exercised the purchase options. ................41

V.      The district court erred in ordering that Walmart and Sam's are entitled to an award of attorneys' fees and costs........................................................47

Conclusion ...................................................................................................50

Statement Regarding Oral Argument .......................................................51

Certificate of Compliance .........................................................................52

Certificate of Service .................................................................................53

## Table of Authorities

### Cases

*Associated Stations, Inc. v. Cedars Realty & Dev. Corp.*,
454 F.2d 184 (4th Cir. 1972) ...............................................................43

*Atkinson Warehousing & Distribution, Inc. v. Ecolab, Inc.*,
99 F. Supp. 2d 665 (D. Md. 2000) ......................................................43

*Baltrotsky v. Kugler*, 910 A.2d 1089 (Md. 2006) ...................................24

*Beall v. Beall*, 434 A.2d 1015 (Md. 1981) ...............................................21

*Beard v. S/E Joint Venture*, 581 A.2d 1275 (Md. 1990) ..................41–42

*Calomiris v. Woods*, 727 A.2d 358 (Md. 1999) ...................... 16, 24, 25, 34–35, 36

*Clancy v. King*, 954 A.2d 1092 (Md. 2008) ......................................16–17

*Credible Behav. Health, Inc. v. Johnson*, 220 A.3d 303 (Md. 2019) ....................16

*David A. Bramble, Inc. v. Thomas*, 914 A.2d 136 (Md. 2007) ...............22

*E. Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175
(4th Cir. 2000) .................................................................................27–28

*Elderkin v. Carroll*, 941 A.2d 1127 (Md. 2008) ......................................22

*Ensor v. Wehland*, 221 A.2d 699 (Md. 1966) ....................................23, 26

*Ferrero Const. Co. v. Dennis Rourke Corp.*, 536 A.2d 1137 (Md. 1988) .............23

*Hyatt v. Romero*, 58 A.2d 899 (Md. 1948) .......................................41, 50

*In re Am. Honda Motor Co., Inc., Dealerships Rels. Litig.*,
315 F.3d 417 (4th Cir. 2003*)* ......................................................14, 46

*Johnson v. Oroweat Foods Co.*, 785 F.2d 503 (4th Cir. 1986) .............42

*Lithko Contracting, LLC v. XL Ins. Am., Inc.*, ___ A.3d ___,
2024 WL 3407452 (Md. July 15, 2024) ...............................15, 17, 33

*Metalcraft, Inc. v. Pratt*, 500 A.2d 329 (Md. Ct. Spec. App. 1985) ....................43

*Mount Vernon Properties, LLC v. Branch Banking And Tr. Co.*,
907 A.2d 373 (Md. Ct. Spec. App. 2006) .......................................28

*Ocean Petroleum Co., Inc. v. Yanek*, 5 A.3d 683 (Md. 2010) ...............................16

*Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*, 923 F. Supp. 2d 745
(D. Md. 2013) .............................................................................21

*Parker v. Columbia Bank*, 604 A.2d 521 (Md. Ct. Spec. App. 1992) .............27–28

*Parkway 1046, LLC v. U. S. Home Corp.*, 961 F.3d 301 (4th Cir. 2020) ........14, 47

*Prince George's County v. Silverman*, 472 A.2d 104
(Md. Ct. Spec. App. 1984) ...........................................................21

*Questar Builders, Inc. v. CB Flooring, LLC*, 978 A.2d 651 (Md. 2009) ..............26

*Riggs Nat. Bank of Washington, D.C. v. Linch*, 36 F.3d 370 (4th Cir. 1994) ........28

*Sky Angel U.S., LLC v. Discovery Commc'ns, LLC*, 885 F.3d 271
(4th Cir. 2018) .......................................................................13–14

*Straley v. Osborne*, 278 A.2d 64 (Md. 1971) .....................................19–21, 23, 24

*Trotter v. Lewis*, 45 A.2d 329 (Md. 1946) ..........................................12, 41

*Vogelhut v. Kandel*, 517 A.2d 1092 (Md. 1986) ....................................41

*Washington Metro. Area Transit Auth. v. Potomac Inv. Properties, Inc.*,
476 F.3d 231 (4th Cir. 2007) ......................................................13, 30

*W. C. Eng., Inc. v. Rummel, Klepper & Kahl, LLP*, 934 F.3d 398
(4th Cir. 2019) ......................................................................30

*Weichert Co. of Md., Inc. v. Faust*, 19 A.3d 393 (Md. 2011) ................................16

**Statutes**

28 U.S.C. § 1332 ...........................................................................1

28 U.S.C. § 1291 ...........................................................................1

## Jurisdictional Statement

The district court had diversity jurisdiction under 28 U.S.C. § 1332.

This Court has jurisdiction under 28 U.S.C. § 1291. The district court's final order was entered on April 5, 2024, JA674-675, and Appellants timely filed their notice of appeal on April 19, 2024, JA676. This appeal is from a final judgment that disposes of all parties' claims.

## Issues Presented for Review

This is a commercial real estate dispute between the Defendants-Appellants, Quarterfield Partners LLC and related entities (together, "Quarterfield"),[1] who are the lessors, and the Plaintiffs-Appellees, Walmart Real Estate Business Trust ("Walmart") and Sam's Real Estate Business Trust ("Sam's"), who are the lessees. The dispute focuses on whether Walmart and Sam's held unconditional options to purchase the properties they leased and, if so, whether they timely and validly exercised those options. Quarterfield presents the following issues for review:

I.      Did the district court err in determining, on summary judgment, that Section 27 of the operative lease agreements granted Walmart and Sam's enforceable (and unconditional, as opposed to conditional) options to purchase the properties?

---

[1] The Appellants are Quarterfield Partners LLC, BL Quarterfield Associates LLC, Q.O.P. Properties LLC, and Quarterfield Office Park LLC.

II.     Did the district court err in determining, on summary judgment, that Quarterfield breached the operative lease agreements by not issuing certain option notices?

III.    Did the district court err in determining, on summary judgment, that Walmart and Sam's timely and validly exercised the options to purchase the properties?

IV.     Did the district court err in its formulation of a damages award that takes no account for the fact that Walmart and Sam's were permitted to delay payment of the purchase price for the properties during the more than five years after they purportedly exercised the purchase options?

V.      Did the district court err in ordering that Walmart and Sam's are entitled to an award of attorneys' fees and costs?

The Court should answer all of these questions in the affirmative and reverse.

## Statement of the Case

This appeal concerns two ground leases that were entered into on April 6, 2005, the "Walmart Lease," JA41-83, and the "Sam's Lease," JA84-126 (together, the "Leases"), pertaining to parcels of real property in a development known as the Quarterfield Crossing Shopping Center, in Anne Arundel County, Maryland. The Walmart parcel is now the site of a Walmart Super Center store, and the Sam's parcel is now the site of a Sam's Club store. Quarterfield is the lessor on both Leases.

The Lease documents for the two parcels are substantively identical in respects material to this appeal, other than the amount of rent to be paid for each property. Both Leases contain a substantively identical Section 27, titled "Option to Purchase," which is at the heart of this dispute:

27. **OPTION TO PURCHASE:**

From the end of the tenth (10th) year of this Lease until the end of the eleventh (11th) year of this Lease (the "Option Term"), Lessor hereby grants to Lessee an option to purchase the Premises from Lessor on the terms and conditions set forth herein (the "Option"). Notwithstanding the foregoing, the Option Term shall not commence until Lessor sends to Lessee two (2) thirty (30) day notices of the commencement of the Option (the "Option Notice"). In the event Lessor fails to send such notice at the end of the ninth (9th) year of this Lease, then the Option Term shall be moved such that it is for a one year period commencing thirty (30) days after the Second Option Notice has been received by Lessee. Lessee may exercise the option to purchase the Premises by providing thirty (30) days notice to Lessor of its election to exercise the Option (the "Option Notice"). In the event Lessee elects to exercise the Option, (i) the purchase price of the Premises (the "Purchase Price") shall be the product of the annual rent at the time of the Option Notice divided by .0825, for example, during the eleventh (11th) year of the Initial Term of the Lease, the Purchase Price [under the Walmart Lease] shall be $772,021.34 divided by .0825 or Nine Million Three Hundred and Fifty Seven Thousand Eight Hundred Thirty Four and 43/100 Dollars ($9,357,834.43),[2] and (ii) the remainder of the terms and conditions of the purchase and sale of the Premises shall be as set forth in the purchase agreement attached hereto

---

[2] The Sam's Lease provided for a purchase price of "$619,524.00 divided by .0825," or "$7,509,381.82." JA101.

as **Exhibit J** and incorporated herein (the "Purchase Agreement"). Lessor and Lessee shall negotiate in good faith any additional terms or conditions required by any material changes of law (other than changes in the tax law) that may occur between the date hereof and the Closing, as defined in the Purchase Agreement. In the event that the parties cannot come to an agreement on any such additional terms or conditions within five (5) business days of a request by either party for the incorporation and modification of terms, either party may notify the other that the matter will be submitted for arbitration to a panel of three real estate experts, each of whom shall be experienced in negotiating agreements for the purchase and sale of the type of property subject to this Lease. Lessor and Lessee shall each select and fully compensate one of these real estate experts and the third shall be selected by the other two and compensated in equal shares by Lessor and Lessee. The panel's decision will be binding on the parties without further rights of appeal.

JA58; *see also* JA100-101.

Certain terms used in Section 27 are defined elsewhere in the Leases. For example, the "Initial Term" is defined in Section 2(c) as being "for a period commencing on the Effective Date and terminating on the date that is twenty (20) years after the Rent Commencement Date, unless sooner terminated or extended." JA44, JA87. The Leases were effective as of the date of full execution, which is the "Effective Date," JA42, JA85, though the lessees' obligations to pay more than nominal rent did not start until the "Rent Commencement Date," which occurred on "the earlier of (i) the date upon which regular business is first conducted from Lessee's building (the 'Building') on the Premises or (ii) the date that is twelve (12)

months after the date (the 'Possession Date') upon which the last of [certain enumerated] conditions … has been satisfied." JA43, JA86. Section 27 does not itself use the term "Rent Commencement Date."

The Walmart Lease was amended 14 times, and the Sam's Lease was amended 17 times. The Fourteenth Amendment to the Walmart Lease says the "Effective Date is April 6, 2005, and the initial term of the Lease shall expire on March 4, 2028, unless sooner terminated or extended as provided in the Lease." JA140. It further notes, in the next paragraph, that the "Rent Commencement Date is March 5, 2008." JA140. The Seventeenth Amendment to the Sam's Lease says the "Effective Date is April 6, 2005, and the initial term of the Lease shall expire on February 20, 2028, unless sooner terminated or extended as provided in the Lease." JA143. It further notes, in the next paragraph, that the "Rent Commencement Date is February 21, 2008." *Id.* Both of these Amendments say that, "[e]xcept as modified herein, all other terms and conditions of the Lease shall remain in full force and effect." JA140, JA143.

The parties also executed, with respect to each Lease, a "Short Form Lease and Memorandum of Option." These documents were to "be used only for recording purposes," though Walmart and Sam's chose not to record them, "and shall not supersede, amend nor replace any covenants of the Lease." JA128, JA135. These documents say:

> In the Lease the Lessor also grants the Lessee an option to purchase the Premises at a purchase price set forth in the Lease between the tenth (10th) and eleventh (11th) lease year. The lease year shall begin on the Rent Commencement Date, as defined in the Lease, which is on or before the date on which Lessee first conducts regular business on the Premises."

JA128, JA135. Both documents were signed years after the Leases were executed, with the Walmart Short Form Lease being signed as of December 15, 2006, and the Sam's Short Form Lease being signed as of March 9, 2007. JA128, JA135.

It is undisputed that Quarterfield did not send notice of the commencement of the Option with respect to either Lease. Accordingly, under the plain language of Section 27, the Option Term never commenced. Nevertheless, on September 19, 2018, counsel for Walmart purported in a letter to Quarterfield to "waive[] Lessor's Option Notice under the Lease and exercise[] the Option." JA149. The same attorney sent a similar letter on behalf of Sam's on January 24, 2019. JA152. Closings on the properties did not occur, and litigation ensued.

On November 29, 2018, Walmart filed a complaint seeking a declaratory judgment, specific performance, and damages for breach of contract. JA3. Quarterfield answered the complaint on December 31, 2018. JA4. On February 14, 2019, Walmart filed an amended complaint that added Sam's as a plaintiff and

asserted virtually identical claims on its behalf. JA14-27.[3] The parties consented to have all proceedings conducted by a magistrate judge. JA5.

On April 12, 2019, then-Magistrate Judge Stephanie A. Gallagher denied Quarterfield's motion to dismiss the amended complaint. JA40. Judge Gallagher found the option clauses ambiguous. She noted they were "not models of clarity" and were "susceptible to more than one meaning" in multiple respects, including as to "how the parties intended to calculate the tenth and eleventh year of the leases, as required by the option" and "whether Plaintiffs could exercise the option in the absence of Defendants' notice, or whether Defendants were permitted to withhold the notice altogether." JA37-38. Accordingly, Judge Gallagher decided, it was "premature" to determine, "as a matter of law, whether Plaintiffs appropriately exercised their options and are entitled to specific performance," as "[d]iscovery [was] needed to permit the parties to explore extrinsic and/or parol evidence" regarding the intentions of the parties and the identity of the drafter, against whom any ambiguities would be resolved. JA38.

On July 10, 2020, then-Magistrate Judge Deborah L. Boardman granted Walmart's and Sam's' motion for partial summary judgment as to their claims for a declaratory judgment and specific performance, and denied Quarterfield's cross-

---

[3] Quarterfield answered the amended complaint on December 31, 2019, JA551-561, with leave to do so being granted on January 17, 2020. JA8.

motion for summary judgment. JA599-600. Judge Boardman acknowledged Judge Gallagher's finding that the Leases were "ambiguous." JA574. But Judge Boardman nevertheless determined the leases were "plain and unambiguous" to the extent they granted Walmart and Sam's "an enforceable option to purchase the property during the option term," and that they were "ambiguous as to when the option term began." JA574. After considering extrinsic evidence, Judge Boardman found "that the option term began at the end of the tenth year after the date the stores opened for business and plaintiffs began paying defendants significant annual rent." JA574. Judge Boardman further decided that the leases unambiguously obligated Quarterfield "to send plaintiffs notices of the commencement of the option term" and that not doing so was "in breach of the lease." JA574. Judge Boardman entered an order declaring:

> 2. Section 27 of each lease grants Walmart and Sam's a valid and enforceable option to purchase the property. Walmart and Sam's have the right to purchase the property in accordance with the terms in Section 27 of their respective leases;

> 3. Defendants Quarterfield Partners LLC, BL Quarterfield Associates LLC, Q.O.P. Properties LLC, and Quarterfield Office Park LLC are ordered to execute the Purchase Agreement with Walmart and Sam's in accordance with the terms in Section 27 of the lease[.]

JA599-600.

Judge Boardman entered an amended order on July 23, 2020, staying proceedings with respect to the remaining count of the amended complaint, Count

III, which sought money damages, and finding that an interlocutory appeal as to the effect of Section 27 of the Leases "may materially advance the ultimate termination of the litigation." JA601-602.

This Court initially granted permission for an interlocutory appeal of Judge Boardman's decision, which was assigned number 20-1927, but later determined that permission to appeal had been improvidently granted and dismissed the appeal on November 10, 2022. JA9-10.

On remand, the parties jointly requested that the court modify the stay that was in place to allow litigation of the remaining count of the amended complaint, while making clear that "Defendants shall not be compelled to convey the subject properties to Plaintiffs until there is a final appealable judgment or any further order of this Court countermanding the stay." JA605. The parties further agreed that the stay automatically would be lifted upon issuance of a final judgment as to the unresolved claim, at which point Judge Boardman's Declaratory Judgment and Amended Order "shall be enforceable or appealable as final judgments." JA605. The parties agreed that "[n]othing contained in this request [to modify the stay] shall prejudice either Party's right to appeal the final judgments of this Court." JA605. The court granted the parties' joint motion and ordered "that Defendants shall not be compelled to convey the subject properties to Plaintiffs until there is a final

appealable judgment or any further order of this Court countermanding the stay." JA609.

After further briefing, Magistrate Judge Timothy J. Sullivan granted in part Walmart's and Sam's' supplemental motion for summary judgment on April 5, 2024 and entered money judgments in favor of Walmart and Sam's and against Quarterfield.[4] JA674-675. Specifically, the court entered a judgment for Walmart for $1,315,756.77 in rent that it had paid for the property since the time, the court found, that closings should have occurred, and entered a similar judgment for Sam's in the amount of $837,689.71, with post-judgment interest running on both judgments. JA674-675. The court further ordered that both Walmart and Sam's could withdraw rent payments they had paid into escrow for the property; and ordered that Walmart and Sam's each "shall be entitled, but not obligated, to credit the entire amount of its judgment together with all post-judgment interest against the purchase price set forth in the purchase agreement for conveyance of the subject property delivered to Quarterfield pursuant to the terms of the lease." JA675. In the same order, the court denied Walmart's and Sam's' request for prejudgment interest, but granted their request for an award of attorneys' fees and costs. JA674-675.

---

[4] Although Quarterfield asked Judge Sullivan to "revisit" Judge Boardman's analysis with respect to Section 27 of the Leases, he declined to do so. JA666.

Quarterfield timely noted this appeal on April 19, 2024. JA676. The court subsequently deferred additional briefing and ruling on Walmart's and Sam's' request for attorneys' fees and costs until after the conclusion of the appeal. JA678. Walmart and Sam's noted a cross-appeal on May 2, 2024 of the court's decision denying their request for prejudgment interest. JA679.

## Summary of the Argument

The plain meaning of Section 27 of the Leases is that Quarterfield agreed to grant Walmart and Sam's a conditional option to purchase the properties during an Option Term that would not commence until Quarterfield sent certain notices of its commencement. Quarterfield had the discretion to send the notices, or not, and the notices operated as a condition precedent. If the notices were not sent at the time specified, the Option Term would be moved until such time as the notices were sent. As Quarterfield has not sent notices of the Option Term, the Option Term has not commenced.

The district court committed a series of compounding errors in deciding otherwise, each building on a previous misstep. The court erroneously decided that Section 27 conveyed a true, unconditional option for a term that ran during the eleventh year of the Leases, regardless of whether or not notices were sent, and that the eleventh year should be counted not from the Effective Date of the Leases, when

11

the parties' landlord-tenant relationship began, but from a later date that was not referred to in Section 27.

The court should have applied an actual plain language reading of Section 27, not one that ignored the key qualifying language that the parties agreed to, and should have applied the law of conditional options, not the misconstrued law of "true" options that it applied instead. The unambiguous language of Section 27 in fact grants a conditional option that would be triggered only in the event that Quarterfield sent notices of its commencement, which is permissible under Maryland law. And, although the question of when the eleventh year of the Leases occurred was only relevant because of the court's erroneous decision that the Option Term would run at a fixed time regardless of whether notices were sent, the court should have calculated the Option Term based on the beginning of the Leases, not some later benchmark. As there was only one permissible reading of the plain language, there was no reason to consider extrinsic evidence, but the court further erred in using extrinsic evidence to override the plain language as to when the Leases began. The contortions the court had to go through to arrive at its ruling awarding specific performance are themselves proof of why this result was incorrect. *See Trotter v. Lewis*, 45 A.2d 329, 332 (Md. 1946) ("One of the fundamental rules of equity is that the court will not decree specific performance of a contract unless it is

definite and certain in all its terms and free from all ambiguity."). These errors warrant reversal and a remand for the entry of judgment in Quarterfield's favor.

On top of these erroneous "liability" determinations, the court fashioned a damages award that puts Walmart and Sam's in far better positions than they would have enjoyed if there had been no "breach." The court has effectively permitted Walmart and Sam's to occupy the properties rent-free for more than five years and to retain the purchase price (and the use thereof) for more than five years after the time they say closings should have occurred, without granting any corresponding benefit to Quarterfield to compensate for the loss of the time-value of that money. The court further erred in deciding that Walmart and Sam's are entitled to an award of attorneys' fees and costs based on a fee-shifting provision in the Leases, even though the gravamen of this case relates to the Purchase Agreements, which require the parties to bear their own litigation expenses.

This Court should reverse in every respect.

## Argument

### Standards of Review

As to Issues I through III, this Court reviews a district court's grant of summary judgment and rulings on issues of contract interpretation *de novo*. *E.g.*, *Washington Metro. Area Transit Auth. v. Potomac Inv. Properties, Inc.*, 476 F.3d 231, 234–35 (4th Cir. 2007); *Sky Angel U.S., LLC v. Discovery Commc'ns, LLC*, 885

F.3d 271, 277–78 (4th Cir. 2018). As to Issue IV, Quarterfield asks that the Court exercise its discretion to undertake plain error review. *See, e.g.*, *In re Am. Honda Motor Co., Inc., Dealerships Rels. Litig.*, 315 F.3d 417, 440 (4th Cir. 2003). As to Issue V, which is also an issue of contract interpretation, the Court again applies *de novo* review. *See Parkway 1046, LLC v. U. S. Home Corp.*, 961 F.3d 301, 312 (4th Cir. 2020).

## I.    The district court erred in determining that Section 27 of the Leases granted Walmart and Sam's enforceable and unconditional options to purchase the properties.

The district court's errors in this case generally flow from its misconstruction of Section 27 of the Leases. The Leases' plain language provides for a conditional purchase option that would not be triggered unless and until Quarterfield sent two notices to Walmart and Sam's of the commencement of the option. The district court effectively ignored the most important part of Section 27, which was language that Walmart's and Sam's' attorney had drafted, JA236-238, and instead determined that the option was unconditional and would be triggered regardless of whether Quarterfield sent the two required notices or not. This was contrary to the option provisions' plain text, and this interpretation was contrary to Maryland law. This Court should reverse.

The court purported to base its ruling on the "plain and unambiguous language of the lease," and ruled that an option was granted in the first sentence of Section 27

"on the terms and conditions" set forth "in the remainder of the option provision." JA583. The court's decision nevertheless reads out of the Leases the very condition stated in the option provision that the parties bargained for. The court ignored two important sentences that expressly qualify any option that might have been conferred and which make any such right conditional. The Leases say, in the second and third sentences of Section 27:

> *Notwithstanding the foregoing*, the Option Term shall not commence until Lessor sends to Lessee two (2) thirty (30) day notices of the commencement of the Option (the "Option Notice"). In the event Lessor fails to send such notice at the end of the ninth (9th) year of this Lease, then the Option Term shall be moved such that it is for a one year period commencing thirty (30) days after the Second Option Notice has been received by Lessee.

JA58, JA101 (all emphasis added). The Supreme Court of Maryland has recently confirmed that the word "notwithstanding" provides the clause in which it appears "with a place of priority over any competing provision," *Lithko Contracting, LLC v. XL Ins. Am., Inc.*, ___ A.3d ___, 2024 WL 3407452, *7 (Md. July 15, 2024), but the court here applied the opposite construction and ultimately chose to ignore it altogether. Under a true plain language reading, the court should have ruled that, because Quarterfield never sent any Option Notices, which it had discretion to send (or not), the Option Term never commenced, and the option has not in fact been triggered. The option depends on a condition precedent—two notices being sent by Quarterfield—that has not occurred.

**A.    The court ignored the plain language of the agreement by reading two sentences out of Section 27, thereby violating the law of objective contract interpretation.**

The court unfortunately ignored the plain text of Section 27 and erroneously held that its meaning was inalterably defined by the first sentence, which, the court said, could not be "limit[ed]" or "alter[ed]" by the second sentence, JA585, thus rendering the second and third sentences meaningless surplusage. This was legal error because it violates the basic principles of Maryland contract law.

Maryland follows the objective theory of contract interpretation, under which "the primary goal … is to ascertain the intent of the parties in entering the agreement and to interpret 'the contract in a manner consistent with [that] intent.'" *Credible Behav. Health, Inc. v. Johnson*, 220 A.3d 303, 310 (Md. 2019) (citation omitted). It is bedrock Maryland law that, "[i]n interpreting a contract provision, [courts] look to the entire language of the agreement, not merely a portion thereof." *Weichert Co. of Md., Inc. v. Faust*, 19 A.3d 393, 400 (Md. 2011) (citation omitted). Maryland law in fact requires courts to "avoid interpreting contracts so as to nullify their express terms," *Ocean Petroleum Co., Inc. v. Yanek*, 5 A.3d 683, 692 (Md. 2010) (quoting *Calomiris v. Woods*, 727 A.2d 358, 366 (Md. 1999)), such as by adopting an interpretation that would "render unnecessary and superfluous a significant portion of the … language in the contract." *Calomiris*, 727 A.2d at 366. "[E]ffect must be given to each clause so that a court will not find an interpretation which casts out or

disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed." *Clancy v. King*, 954 A.2d 1092, 1101 (Md. 2008) (citation omitted).

The court's reasoning was neither sensible nor reasonable. In straining to fit its ruling within the parameters of a decision it claimed was based on the "plain and unambiguous language" of Section 27, JA585, even though it disregarded the most important part of that section, the court's analysis suffered from several internal inconsistencies. For example:

- Although the court acknowledged that, "[b]y its plain language, the second sentence establishes the requirement for two notices to issue before the Option Term commences," JA585, it nevertheless effectively held that the Option Term commenced without the notices having been issued. JA574, JA596.

- The court similarly acknowledged the "Notwithstanding the foregoing" language—which it should have read as signaling that the following text had priority over and controlled or limited or qualified the preceding text, *see Lithko Contracting*, *supra*, 2024 WL 3407452 at *7—but nevertheless held that "the language that follows does not limit the option to purchase that was granted in the first sentence or make it dependent on Quarterfield's decision to sell." JA585.

- And, although the court determined that Section 27 "clearly contemplated that Walmart and Sam's would have an option to purchase the properties during an option term after receiving notice of the option term from Quarterfield," JA584, and "the second sentence confirms that the parties intended that there would, in fact, be an Option Term but it would not commence until the notices were sent," JA585, the court nevertheless went on to hold that Walmart and Sam's timely exercised the options, meaning the Option Terms commenced without notices being sent. JA596.

These inconsistencies cannot be reconciled. As explained above, they do not square with established Maryland law on contract interpretation or, as explained below, Maryland law on option contracts in particular. The court effectively skipped over the question whether the options at issue were "true" options, which they are not. Then, having incorrectly labeled them as "true" options, the court proceeded to ignore the qualifying "Notwithstanding the foregoing" language that made them conditional options, even though it mandated a different conclusion. This language is not just inconsistent with the notion of a "true" option; it is proof that the Leases did not confer "true" and unconditional options in the first place.[5]

---

[5] Although the court purported to rest its decision on the plain language of the Leases, it said in a footnote, as a fallback alternative, that extrinsic evidence "confirms the option was not conditioned on Quarterfield's decision to sell." JA587. The extrinsic evidence the court relied on said no such thing. The court based its

## B. The court erred again by applying Maryland law governing "true" options, which is different than the law governing the conditional options in the Leases in this case.

The court seems to have decided that the "Notwithstanding the foregoing" language was legally ineffective and could not mean that the options would only be triggered if notices were issued because, in its view, options are "irrevocable during the stated period." JA584. But that is correct only with respect to certain types of options, deemed "true" options in Maryland decisional law, and it is not correct with respect to conditional options, such as the options in the Leases here. The legal analysis in the court's opinion confirms that it erroneously focused on Maryland law involving "true options" and ignored Maryland law on "conditional options." Contrary to the court's conclusion, Maryland law allows for options conditioned on the property owner's willingness to sell without deeming them "illusory" contracts. JA584-587.

A "true" option—unlike the conditional options in this case—is "a continuing and irrevocable offer by the optionor, which cannot be withdrawn by him during the

---

footnote on a Short Form Lease and Memorandum of Option that merely referred to there being in the Leases "an option to purchase the Premises at a purchase price set forth in the Lease between the tenth and eleventh lease year," JA128, JA135, which said nothing about the terms or conditions of the option. Moreover, this document says that it "shall be used only for recording purposes," even though it was never recorded, and that it "shall not supersede, amend nor replace any covenants of the Lease." JA128, JA135. These documents thus were of no utility in determining the meaning of Section 27—especially to the extent they contradict the terms of the Leases, which they do—and they should not have been considered.

stated period." *Straley v. Osborne*, 278 A.2d 64, 68 (Md. 1971). But that is not the only variety of option that exists under Maryland law. As the *Straley* court explained:

> <u>On the other hand</u>, if there exists what has been termed a right of first refusal, a first option, conditional option, or first privilege of purchase, [an option] right is conditional. Professor Corbin describes these rights as 'closely related (to options) with respect to the purposes for which they are made and yet are very dissimilar in the legal relations of the parties who make them.'

*Id.* at 68–69 (citation omitted) (emphasis added). In such a case, "the holders of the 'right' possess[] no absolute power to require the property owner to sell at any time" and "whatever rights they [have are] conditioned upon the owners' decision to sell the property.'" *Id.* at 69. Thus, unlike a "true" option, a conditional option does <u>not</u> "create a continuing or irrevocable offer by the owner of the property to sell." *Id.* A conditional option depends instead on the property owner's future willingness to sell.

As the *Straley* court made clear, a provision's effect depends on a "reading of the instrument as a whole," and an option may actually be conditional despite the use of language usually associated with "true" options. *Id.* (noting the "problems which are created by combining the word 'option' [with] conditional terms such as 'first'").[6] There, "[a]ccording to the terms of the lease, Straley only had the right, by

---

[6] The pertinent language in *Straley* was: "9. During the five-year term of this Lease and during any renewal term thereafter the Lessee shall have the first option of purchasing this property at current market value at the time of the exercise of the option should the Lessor, WILBUR HAUGH, his heirs, assigns or personal representatives, decide to sell said property. …" 278 A.2d at 66.

whatever name designated, of having the first opportunity to purchase the demised property in the event that Haugh decided to sell," which, as here, depended on the property owner giving notice of that intention. *Id.*

The district court should have recognized that the options at issue were conditional and should have applied Maryland law concerning conditional options. The court relied instead on the portion of *Straley* discussing "true" options, and on other decisions that it recognized as dealing with "true" options, or that were decided on grounds that are somewhat removed from the law of options pertinent to this case. JA584-586. These decisions are readily distinguishable.

The decisions the court cited generally focused on issues not present in this case. In *Beall v. Beall*, 434 A.2d 1015 (Md. 1981), the court held the purported extension of an option contract did not satisfy the statute of frauds and the death of one owner of the property as tenants by the entirety caused the option to lapse before being exercised. In *Prince George's County v. Silverman*, 472 A.2d 104, 112, 113 (Md. Ct. Spec. App. 1984), the court found the agreement at issue was revocable and, therefore, "cannot be deemed an option contract" and found that, because the terms of a statute requiring county council approval were not complied with, the county was deemed to have accepted an offer to purchase. In *Paccar Inc. v. Elliot Wilson Capitol Trucks LLC*, 923 F. Supp. 2d 745, 749 (D. Md. 2013), the court distinguished between options, which are binding, and rights of first refusal, which

are not, and which "ripen" into options "once the holder of such right is notified by the property owner of the terms of a third-party offer to purchase the property," and focused its decision on whether the notice given was sufficient. In *Elderkin v. Carroll*, 941 A.2d 1127, 1129 n.2, 1129–30 (Md. 2008), the court noted there was a "serious question" whether an option agreement even existed in that case but, given the parties' apparent agreement on that point, went on to consider whether it was properly exercised. And, in *David A. Bramble, Inc. v. Thomas*, 914 A.2d 136, 149–50 (Md. 2007), the court ultimately focused on whether a new term was validly added to a triggering offer and whether the right of first refusal at issue was validly exercised thereafter.

None of these cases dealt with the type of option at issue here—a conditional option that is triggered only by the decision by one party, Quarterfield, to send notice of its commencement—and the court erred in relying on and applying them in this case.

### C. The court erred again by directing its ruling to avoid an interpretation that it believed would create an illusory contract, or that would render other terms superfluous, which was not the case.

A conditional option is not an illusory contract, and the court further erred to the extent it felt constrained to avoid a holding that it worried would convert Section 27 into one. Again, although a "true" option could not have been unilaterally withdrawn during the option period, Section 27 does not convey a "true" option, but

rather a conditional option, and by its plain terms Quarterfield had the unilateral power to trigger it.

As the *Straley* court explained, conditional options, such as rights of first refusal, do not convey any "absolute power to require the property owner to sell at any time" and any rights conveyed by the option are instead "conditioned upon the owners' decision to sell the property." 278 A.2d at 69. Such an instrument does not "create a continuing or irrevocable offer by the owner of the property to sell." *Id.* The court there expressed no concern about it being an illusory contract. In *Ensor v. Wehland*, 221 A.2d 699, 700, 703 (Md. 1966), the court similarly interpreted an option contract that would arise only "in the event … the owner of the property, shall decide to sell," and gave notice of that intention, as being "clear and unambiguous." The court, therefore, found it "unnecessary to consider the rule that an interpretation which gives a lawful and effective meaning to a manifestation of intention is preferred to an interpretation which may make the contract unlawful or of no effect," such as in the event it was barred by the rule against perpetuities. *Id.* at 703.[7]

Contrary to the court's analysis, under these cases, Quarterfield indeed "could elect not to give notice of the option at all, thereby unilaterally depriving plaintiffs

---

[7] The rule against perpetuities "does not apply to a lessee's option to purchase all or part of the leased premises." *Ferrero Const. Co. v. Dennis Rourke Corp.*, 536 A.2d 1137, 1140 (Md. 1988).

of the benefit of the option," and the court erred in deeming such result "contrary to law" and in interpreting *Straley* as holding otherwise. JA589.

There would have been nothing unfair or inequitable to Walmart or Sam's about a decision holding the parties to the bargain they agreed to, as expressed in language that Walmart and Sam's drafted. JA236-238. Doing so would have been "harmonious with the overarching contract law principle that express contract terms are enforced as written." *See Baltrotsky v. Kugler*, 910 A.2d 1089, 1099 (Md. 2006). Indeed:

> It is a fundamental principle of contract law that it is "improper for the court to rewrite the terms of a contract, or draw a new contract for the parties, when the terms thereof are clear and unambiguous, simply to avoid hardships." Contracts play a critical role in allocating the risks and benefits of our economy, and courts generally should not disturb an unambiguous allocation of those risks in order to avoid adverse consequences for one party. In the absence of fraud, duress, mistake, or some countervailing public policy, courts should enforce the terms of unambiguous written contracts without regard to the consequences of that enforcement. Thus, as noted above, the court has no choice but "to presume that the parties meant what they expressed," and it may not look to "what the parties thought that the agreement meant or intended it to mean."

*Calomiris*, 727 A.2d at 368 (citations omitted). It bears noting that Walmart and Sam's had analogous unilateral rights under the Leases, including the right to terminate them during an initial study period "for any reason or for no reason," simply by delivering notice of that decision. JA51, JA94. Even though the court was

aware of that provision and its effect, JA591, it apparently was not troubled by that similar imbalance of authority.

The court's stated concern that Quarterfield's interpretation "also would render meaningless the extensive language in the remainder of the section discussing plaintiff's right to elect to exercise its option, the calculation of the purchase price, the incorporation of a purchase agreement, the requirement to negotiate the terms of sale in good faith, and the arbitration requirements," JA586, was misplaced. By the same logic, allowing Walmart and Sam's to exercise the purchase option rendered meaningless the Leases' detailed provisions regarding 16 Extension Periods of five years each, including differing amounts of rent to be paid during each Extension Period. JA44-45, JA87-88. If Walmart and Sam's were to exercise the option during the Initial Term of the Leases, the Extension Periods would not occur and the provisions governing them would be rendered surplusage, but the court apparently was not troubled by that inconsistency.

The fact that certain contract terms may only be triggered by a condition does not mean that they are superfluous in the event the condition does not occur, and a court is not empowered to deem the condition to have occurred in a misguided attempt to "save" a contract from ineffectiveness. *E.g.*, *Calomiris*, 727 A.2d at 368 ("[I]t is 'improper for the court to rewrite the terms of a contract, or draw a new contract for the parties, when the terms thereof are clear and unambiguous, simply

to avoid hardships.'") (citation omitted). And, even if this were a valid concern, which it is not, the principle the court relied on is not absolute or even particularly strong. At the end of the day, the common law's "prefer[ence]" for contractual constructions that make a contract effective, rather than illusory or ineffective, *Questar Builders, Inc. v. CB Flooring, LLC*, 978 A.2d 651, 670 (Md. 2009), is just that—a preference—that cannot stand in the way of a clear and unambiguous contract term. *See Ensor*, 221 A.2d at 703.

The court should have enforced the purchase option in accordance with its plain language, as it purported to do. The court's ruling actually ignored two sentences of Section 27, based on misguided legal analysis, and held the option was a "true" option. Any option was actually conditional, and proper consideration of the entirety of Section 27 mandates the opposite result. This Court should reverse.

## II. The district court erred in determining that Quarterfield breached the operative lease agreements by not issuing the option notices.

After ignoring the "Notwithstanding the foregoing" language in Section 27 and rejecting the plain language reading of that passage—which says the "Option Term shall not commence" until Quarterfield sends Walmart and Sam's two notices of the "commencement of the Option"—the court proceeded to transmute the meaning of that passage into something altogether different from its actual text. Although it acknowledged the absence of language stating that Quarterfield "must"

send the notices or was "required" to send them, the court nevertheless concluded that Quarterfield had an implied "obligation" to send the notices. JA588.

The court relied on the thin reed that there was a "consequence" in the event Quarterfield "fails" to send the notices on time, namely, that the Option Term would be moved, JA588, as proof that Quarterfield had an obligation to send them. The court proceeded to ignore this consequence in later holding that the Option Term existed between the tenth and eleventh anniversaries of the Rent Commencement Date regardless of whether notice was sent. JA596. And, perhaps indicative of the lack of textual support, the court found Quarterfield's refusal to send the notices was "inconsistent" with the "general obligations of good faith and fair dealing" that are implied in certain contracts, without relying on any provision of the Leases themselves. JA588-589.

The court thereby ignored Maryland law, as explained by this Court, that "the covenant of good faith and fair dealing 'does not obligate a [party] to take affirmative actions that the [party] is clearly not required to take under [the contract].'" *E. Shore Markets, Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 182 (4th Cir. 2000) (quoting *Parker v. Columbia Bank*, 604 A.2d 521, 531 (Md. Ct. Spec. App. 1992)). "Rather, the duty 'simply prohibits one party to a contract from acting in such a manner as to

prevent the other party from performing his obligations under the contract.'"[8] *Id.* at 182–83 (quoting *id.*). As this Court also has said, "[a]n implied duty of good faith cannot be used to override or modify explicit contractual terms." *Riggs Nat. Bank of Washington, D.C. v. Linch*, 36 F.3d 370, 373 (4th Cir. 1994). *See also Mount Vernon Properties, LLC v. Branch Banking And Tr. Co.*, 907 A.2d 373, 382 (Md. Ct. Spec. App. 2006) ("no independent cause of action at law exists in Maryland for breach of the implied duty of good faith and fair dealing").

The court then repeated its earlier errors by again stating inapposite law that an option "cannot be unilaterally withdrawn by the optionor," which incorrectly assumed the options at issue were "true" options instead of the conditional options they actually are, and that interpreting the Leases to allow Quarterfield to choose whether to give notice "would render the option illusory and unenforceable." JA589. Both of these repeated conclusions are incorrect for the same reasons as stated above with respect to the court's first iteration of them.

The only reasonable reading of Section 27's provision that "the Option Term shall not commence until Lessor sends to Lessee" two 30-day notices is that the Option Term would not commence if Quarterfield elected not to send the notices. Instead, without any credible textual support and only after impermissibly elevating

---

[8] Quarterfield did not prevent Walmart or Sam's from performing "obligations." To the contrary, Quarterfield exercised its discretion not to extend Walmart and Sam's a benefit, which was Quarterfield's right under the Leases.

an implied duty of good faith and fair dealing to override the actual text, the court found "that Quarterfield had a contractual duty to provide notice, which it failed to do." JA589. This was error.

\* \* \*

The effect of the court's erroneous decisions that the Leases did not give Quarterfield discretion whether to send notices of the Option Terms, and that Quarterfield breached the Leases by not sending notices, is that the notices were deemed to have been sent, even though it is undisputed that they never were sent, or that the Option Terms commenced without them having been sent, even though the plain text of the Leases guaranteed that the Option Terms would not commence until they were sent. Those errors themselves mandate reversal and a remand for the entry of judgment for Quarterfield, and all of the district court's other erroneous decisions flow from those errors. The court's subsequent decisions are erroneous for independent reasons as well, as explained below.

III.   **The district court erred in determining that Walmart and Sam's timely and validly exercised the options to purchase the properties.**

The court committed multiple further errors in determining that Walmart and Sam's timely and validly exercised the purchase options. These errors flow from the court's erroneous decision to ignore the third sentence of Section 27, which provides for the Option Term to be moved in the event notices were not sent and, accordingly, means that the Option Term is not a fixed, static period. In any event, even assuming,

as the court did, that the Option Term was a fixed period, the court should have found, based on the plain and unambiguous language of the first sentence of Section 27, that the specified time for Walmart and Sam's to exercise the options expired years before they attempted to do so—and, accordingly, that their attempts to exercise the options were untimely—and the court should not have ruled as a matter of law that the extrinsic evidence supported Walmart's and Sam's' preferred reading in any event. *See Washington Metro. Area Transit Auth. v. Potomac Inv. Properties, Inc.*, 476 F.3d 231, 235 (4th Cir. 2007) (summary judgment is appropriate only "when the contract in question is unambiguous or when an ambiguity can be definitively resolved by reference to extrinsic evidence"); *see also W. C. Eng., Inc. v. Rummel, Klepper & Kahl, LLP*, 934 F.3d 398, 403–05 (4th Cir. 2019).

> **A.** **The plain language of Section 27 only allows for one permissible meaning: that the "eleventh year" of "this Lease" should be determined running from the beginning of the Lease, not the beginning of some later period.**

The plain language of Section 27, when coupled with how terms are defined elsewhere in the same Lease document, is unambiguous as to when an Option Term would commence if the notices were timely sent or—as the court here effectively ruled—were deemed to have been sent.

In the first sentence of Section 27, which the court found to be binding and which the court erroneously believed precluded a finding that the option was conditional, the parties agreed that the "Option Term" would run "[f]rom the end of

the tenth (10th) year of this Lease until the end of the eleventh (11th) year of this Lease." JA58, JA100. In the fifth sentence of Section 27, which sets forth the purchase price to be paid, "[i]n the event Lessee elects to exercise the Option," the example given for calculating the price is based on it being exercised "during the eleventh (11th) year of the Initial Term of the Lease." JA58, JA101. The Leases also say, in Section 2(c), that the "initial term of this Lease shall be for a period commencing on the Effective Date and terminating on the date that is twenty (20) years after the Rent Commencement Date, unless sooner terminated or extended (the 'Initial Term')." JA44, JA87. The "Effective Date" is set in the initial, un-numbered paragraph of the Leases as "the date upon which the last of Lessor and Lessee executed this Lease." JA42, JA85.

There is only one fair or reasonable reading of these provisions, and that is that the Option Term would run from the tenth to eleventh anniversaries of the Effective Date, which is the day on which the Initial Term of the Lease commenced—that is, from April 6, 2015 to April 6, 2016. Because Walmart attempted to exercise its option in September 2018, and Sam's attempted to exercise its option in January 2019, both attempts came too late and were ineffective.

The court nevertheless allowed for an alternate reading of the Leases based on the "Rent Commencement Date," which is a term that does not appear in Section 27 at all. The Rent Commencement Date did not define the commencement of the

Lease but rather the end of the study period and the beginning of the 20-year portion of the Initial Term during which Walmart and Sam's would pay more than nominal rent. As the court noted, the Initial Term included both the pre-Rent Commencement Date study period and the post-Rent Commencement Date 20-year period, resulting in the Initial Term comprising "a combined period of more than twenty years." JA591. The court read further and relied on yet another section of the Leases, Section 3(b), setting out the rent to be paid by Walmart and Sam's "[d]uring the Initial Term and any properly exercised Extension Period," and its generic use of the undefined phrase "initial twenty (20) year term," JA45, JA87, as suggesting that the Leases did not really begin until the Rent Commencement Dates. Although Section 27 does not refer to the study period or the Rent Commencement Date in any way, the court found that the Rent Commencement Date marked "the beginning of significant contractual obligations" for both parties, as it cut off Walmart's and Sam's' unilateral rights to terminate the Leases and sparked the beginning of the payment of significant rent for both properties, and, accordingly, should mark the Leases' starting points. JA592.

The court mistakenly believed—based on its consideration of different defined terms or undefined terms used generically in the Leases, both pulled out of context from other, unrelated sections of the Leases—that this gave rise to two permissible meanings of Section 27: either "the eleventh year of 'this Lease' began

eleven years into the 'Initial Term' or eleven years into the 'initial twenty (20) year term.'" JA591. Or, as the court also put it, it believed there was a choice whether the Option Term "should be calculated using the Effective Date of the lease or the Rent Commencement Date of the lease" as the starting point. JA592. The court proceeded to consider extrinsic evidence to resolve the perceived ambiguity, and then chose the latter interpretation.

The court should not have found that there were two possible meanings of this part of Section 27 and, accordingly, should not have proceeded to consider extrinsic evidence. Extrinsic evidence "may be considered only after a court first determines that the relevant contract language is ambiguous, which occurs when, viewing the plain language in its full context, 'a reasonably prudent person could ascribe more than one reasonable meaning to it.'" *Lithko Contracting*, *supra*, 2024 WL 3407452, at *5 (citation omitted). The only permissible reading of Section 27 is that the Option Term referred to the eleventh year "of this Lease" starting when the Lease actually began, on the Effective Date. The court inappropriately relied on a term that does not appear in Section 27, the "Rent Commencement Date," as controlling the meaning of Section 27. If anything, the Rent Commencement Date is more useful for determining when the Initial Term of the Lease would end (20 years after the Rent Commencement Date), rather than when it began (on the Effective Date). The only permissible reading of Section 27 was that the eleventh year of "this Lease"

should be counted from the time the Lease actually began, on the Effective Date, not from some later benchmark pulled from an unrelated section of the Lease. The court should have found that this was the only permissible reading under Maryland law, and it erred in deciding otherwise.

**B.    Although the court should not have considered extrinsic evidence, it further erred in ruling as a matter of law in favor of Walmart and Sam's on that extrinsic evidence.**

The district court failed to appreciate the limitations Maryland law places on a court's consideration of extrinsic evidence in contract interpretation, and it drew the wrong conclusion from that extrinsic evidence in any event. The extrinsic evidence "must help interpret the ambiguous language and must not be used to contradict other, unambiguous language in the contract." *Calomiris*, 727 A.2d at 366. Evidence of "prior or contemporaneous agreements or negotiations" is inadmissible "to vary or contradict a written contractual term," as "a written agreement 'discharges prior agreements,' thereby rendering legally inoperative communications and negotiations leading up to the written contract." *Id.* at 361–62 (citation omitted).[9] Subsequent understandings or communications also are inadmissible to vary a written contract's terms or meaning. *Id.* at 367. These

---

[9] Indeed, the Leases were fully-integrated agreements. JA56, JA99. ("(h) This Agreement and the Exhibits attached hereto contains the entire agreement among the parties hereto, supersedes all prior agreements and may be modified only in writing signed by both the Lessor and Lessee.").

restrictions are especially important in real property transactions, which are subject to the statute of frauds. *Id.*

Instead of heeding the *Calomiris* court's admonitions about not considering pre-contract negotiations, the district court proceeded to consider letters of intent that passed between the parties' real estate brokers between September and December 2003, more than a year before the Leases were executed in 2005. JA592-593. The letters of intent described a "Purchase Option" that is quite different than Section 27 of the Leases:

> Tenant shall have a one-time option to purchase the Property at an eight and a quarter percent (8.25%) cap rate. Landlord will deliver notice to Tenant one hundred eighty (180) days prior to the end of the 10th anniversary of Rent Commencement. Tenant shall have up to one hundred and eighty (180) days to close on the property after notice is received by Tenant from Landlord.

JA189, JA192-93, JA197, JA201. The fact that the letters referred to a notice being given "one hundred eighty (180) days prior to the end of the 10th anniversary of Rent Commencement," starting a 180-day clock for the "Tenant" to close on the property, has no bearing on the meaning of the different provision the parties ultimately agreed to. Section 27 instead refers to an "Option Term" existing "[f]rom the end of the tenth (10th) year of this Lease until the end of the eleventh (11th) year of this Lease," which "shall not commence until Lessor sends to Lessee two (2) thirty (30) day notices of the commencement of the Option," and which "shall be moved" in the

event the notices were not sent. JA58, JA100-101. The letters referred to a different period of time, using different terms, and contained different notice requirements. The fact that the letters of intent are so different from Section 27 is proof that the parties in fact agreed to something different, and their actual agreement is what must control.[10]

The letters of intent should not have been considered as proof of anything in any event. They were not signed by any of the parties. Though each contained signature blocks for their signatures in the event the "above general terms and conditions [were] acceptable," they are blank. *E.g.*, JA189. And, none of the letters of intent was binding upon the parties, as each stated:

> This letter is solely intended as a memorandum for the parties hereto to express the terms upon which the parties would be willing to enter into lease negotiations and regardless of anything contained herein, for the protection of both parties, this letter does not constitute an enforceable agreement and neither party shall be under any binding obligation to the other until a Ground Lease is drawn and executed by both of the parties.

*E.g.*, JA189. The letters of intent should not have been considered under *Calomiris*, because they predated the written contract and are not consistent with it, and they are so different from Section 27 that they were not relevant in any event.

---

[10] It is not at all clear what the letters meant by a period of time "prior to the end of the 10th anniversary," *e.g.*, JA189, as the "anniversary" of a date generally refers to one particular day, not a period of days or even a year-long period that would "end" at some point.

The district court should not have considered contradictory documents that came after the Leases either, but it relied on a "Short Form Lease and Memorandum of Option" with respect to each Lease as "confirm[ing]" the "parties' understanding in their pre-lease letters of intent." JA593. These "Short Form" documents were quite different from both the letters of intent (which are irrelevant) and the Leases, and they do not actually confirm anything. As their titles suggest, and in contrast to Section 27, they are "short." They say, in pertinent part:

> In the Lease the Lessor also grants the Lessee an option to purchase the Premises at a purchase price set forth in the Lease between the tenth (10th) and eleventh (11th) lease year. The lease year shall begin on the Rent Commencement Date, as defined in the Lease …

JA128, JA135. This is very different from the letters of intent and, more importantly, different from Section 27's reference to an "Option Term" existing "[f]rom the end of the tenth (10th) year of this Lease until the end of the eleventh (11th) year of this Lease." JA58, JA100-101. Again, Section 27 did not use the term "Rent Commencement Date." And, although the court took them to mean this, the Short Form documents do not even clearly say that the lease years should be counted from the Rent Commencement Date, just that "[t]he lease year shall begin" on that date. JA128, JA135. They also do not refer to a period of time during which an option could be exercised, as the time "between" two consecutive lease years really refers to the infinitesimal instant between the end of one year and the beginning of the next.

The only thing the Short Form documents confirm is the parties' intent that they would have limited effect and, in particular, that they would not change the Leases:

> Each party agrees that this Short Form Lease shall be used only for recording purposes and shall not supersede, amend nor replace any covenants of the Lease.

JA128, JA135. The Short Form documents apparently were not recorded, and so they served no useful purpose. They should not have been considered in any event to the extent they varied from the terms of Section 27, which they did, especially in light of the parties' expressed intent that they not "supersede, amend nor replace" the Lease. JA128, JA135. The district court overrode that intent by deferring to the Short Form documents' different text instead of the words the parties actually used in Section 27, which is what should have controlled the analysis.

Although the court said the deposition testimony offered by both sides "does not provide much in the way of useful extrinsic evidence," it nevertheless proceeded to place undue weight on an argument Walmart and Sam's crafted extrapolating from a comment by Quarterfield's corporate designee. JA594-595. Quarterfield's designee indeed testified that it did not want to agree to a purchase option but Walmart did. JA309-311. That fact was essentially undisputed. Quarterfield believed it was more advantageous to continue to lease the properties than to sell them, for a variety of reasons that included "tax reasons, estate planning reasons, financing." JA311.

Walmart's counsel cut off the designee's testimony on this point. JA311-312. Quarterfield submitted an affidavit further explaining that, "[a]fter many months of negotiation," Walmart's attorney, Pamela Belleman, drafted the "Notwithstanding the foregoing" language of Section 27, which resolved the impasse about whether the Leases would include a purchase option. JA550.[11] Section 27 was then acceptable to Quarterfield because, "unless Quarterfield elected to sell the Premises, Walmart and Sam's had no opportunity to purchase them." JA550. Quarterfield believed that having a purchase option included was important to Walmart and Sam's, whether it ultimately would be triggered or not, because of negotiating positions they were taking with respect to other leases. JA550.

The court took that deposition testimony by Quarterfield's designee and stretched it a few steps further than was fair. The court reasoned that Quarterfield would not have actually wanted the Option Term to commence earlier—*i.e.*, if the eleventh year of the Lease were counted from the beginning of the Lease as opposed to the Rent Commencement Date—because that would mean it might collect less rent before the options were exercised. JA594-595. That is not what Quarterfield's designee said, and this is an unfair inference from the evidence. As Quarterfield's

---

[11] It was undisputed that Walmart's transactional attorney, Ms. Belleman, drafted this language, as she admitted doing so, though Walmart's litigation attorney instructed her not to answer why she did so or what the intent of including this language was. JA236-238.

affidavit says, Quarterfield believed the purchase option could only be exercised if it elected to send notice, and the text of Section 27 further provided for the Option Term to be moved to a later time if notice was not sent. The notion that the options could only be exercised during a fixed period, the eleventh year "of this Lease," is itself a fruit of the court's erroneous ruling that, even though the notices were not sent, they would be deemed to have been sent as of the time specified in the first sentence of Section 27. This completely ignored the provision in the third sentence of Section 27 that the Option Term "shall be moved" if notice was not sent "at the end of the ninth (9th) year of this Lease."[12] JA58, JA101. Again, as Quarterfield never sent notice, the Option Term never commenced.

Although the court should never have ruled that Section 27 required Quarterfield to send notice, or that the Option Term occurred without notice having been sent, the court compounded its error in its determination of when the Option Term took place. The court should have ruled, based on the plain language of Section 27, that the Option Term described in the first sentence of Section 27 referred to the eleventh year "of this Lease" running from the Effective Date of the Lease, without resorting to extrinsic evidence. Having proceeded to consider extrinsic evidence, the court erred again in reading it to favor Walmart's and Sam's' interpretation. Under

---

[12] The reference to the "ninth" year of the Lease may be a relic from an earlier revision, JA498, but the intention that the Option Term "shall" be moved is unmistakable.

the plain language of Section 27, the eleventh year "of this Lease" expired long

before Walmart or Sam's purported to exercise the options, and their purported

notices were untimely. In other words, the court erred in construing Section 27 in

such a way as to find that Walmart and Sam's timely exercised the options, when

that was not the case. This Court should reverse.[13]

IV.  **The district court erred in its formulation of a damages award that takes no account for the fact that Walmart and Sam's were permitted to delay payment of the purchase price for the properties during the more than five years after they purportedly exercised the purchase options.**

"Damages for breach of a contract ordinarily are that sum which would place

the plaintiff in as good a position as that in which the plaintiff would have been, had

the contract been performed." *Beard v. S/E Joint Venture*, 581 A.2d 1275, 1278 (Md.

---

[13] The court's footnote reasoning that calculating the Option Term as running from the Effective Date would have resulted in a failure of consideration is legally incorrect. JA595. Although the court was attempting to be solicitous to Quarterfield's position, there is no particular amount of rent that would have made the purchase option supported by sufficient consideration or not. As the cases the court cited clearly say, "where an option is incorporated in a lease, the privilege of becoming a purchaser of the property may be treated as part of the consideration supported by the rent, and the option can be held supported by valuable consideration." *Trotter v. Lewis*, 45 A.2d 329, 333 (Md. 1946). "[I]t is not necessary that the consideration shall have been given exclusively for the option." *Hyatt v. Romero*, 58 A.2d 899, 902 (Md. 1948). The adequacy of consideration did not depend on the amount of rent to be collected, or whether a certain construction of the contract resulted in more rent being collected than another. To the contrary, "[i]t is basic contract law that courts generally will not inquire as to the adequacy of consideration" and "anything which fulfills the requirement of consideration, that is, one recognized as legal, will support a promise, whatever may be the comparative value of the consideration and of the thing promised." *Vogelhut v. Kandel*, 517 A.2d 1092, 1096 (Md. 1986).

1990). *See also Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 506 (4th Cir. 1986) ("In Maryland, a party suffering a breach of contract is entitled to recover as damages the amount that would place him in the position he would have been in had the contract not been broken.") (footnote omitted) (remanding for new trial on damages where award put plaintiff "in a better position than he would have enjoyed in the absence of a breach").

The court here nevertheless placed Walmart and Sam's in far better positions than they ever could have been had the purchase options been exercised and the properties been conveyed at the times they claim closing should have occurred. The effect of the court's damages ruling is that Walmart and Sam's will have been permitted to use and occupy the properties for free since 2019,[14] while at the same time Quarterfield has not had the use or enjoyment of the purchase price since that time. This amounts to a huge windfall to Walmart and Sam's and an unjust penalty to Quarterfield. Maryland law is clear that a plaintiff should not be put in a better position than it would have been in if a breach had not occurred, but this is what

_____

[14] Walmart and Sam's paid Quarterfield rent for a period of time after the dates by which Walmart and Sam's say that closings on the properties should have occurred, in January and May 2019, and they paid rent into escrow for a period of time after that, starting in October 2020, before ceasing escrow payments, by agreement, in March 2023. JA628. The court entered a judgment against Quarterfield for the rent Walmart and Sam's had paid to Quarterfield and also ordered that Walmart and Sam's could withdraw the sums they had paid into escrow. JA674-675.

happened here. *See Atkinson Warehousing & Distribution, Inc. v. Ecolab, Inc.*, 99 F. Supp. 2d 665, 672 (D. Md. 2000) ("Since plaintiff is entitled to recover only just and adequate compensation for its injury and no more, it necessarily follows that its recovery must be limited to fair compensation for the loss which does not place it in a better position than it would have been in had the contract not been broken."); *see also Metalcraft, Inc. v. Pratt*, 500 A.2d 329, 336, 337 (Md. Ct. Spec. App. 1985) ("Ordinarily, the injured party should not be placed in a position better than the one he would have occupied had the contract not been breached."); *Associated Stations, Inc. v. Cedars Realty & Dev. Corp.*, 454 F.2d 184, 188 (4th Cir. 1972) (expressing general contract law principle and noting that, where necessary, courts resort "to alternative methods of computing damages in order to insure that, as far as possible, the plaintiff neither loses nor benefits from the breach").

Quarterfield acknowledges that this argument could have been better presented to the district court. The amounts of rent paid by Walmart and Sam's to Quarterfield for a period, and then into escrow thereafter for another period, before the parties agreed in March 2023 that Walmart and Sam's would stop making escrow payments, were undisputed. Quarterfield nevertheless raised the following points in its opposition to the Plaintiffs' motion for summary judgment as to Count III of their amended complaint, which led to the court's damages ruling:

- "Plaintiffs did not [lose] anything of material value."

- "Walmart paid $1,315,756.77 in lease payments during this litigation, but it retained during this period the beneficial use of funds representing the $9,357,834.43 purchase price that, on Walmart's theory of this case, was due to Quarterfield on January 17, 2019."

- "Similarly, Sam[']s made lease payments of $837,689.71, but it retained during this action the use of funds representing the $7,509,381.82 purchase price it claims was owed on May 24, 2019."

JA647. These points were raised obliquely, in opposition to Walmart's and Sam's' request for prejudgment interest, and not as a more express argument that the court should afford some consideration to Quarterfield's lost time value of money in fashioning its damages ruling. But these points were raised nevertheless, and the court should have taken this important issue into account.

The court indeed acknowledged Quarterfield's argument in its discussion denying Walmart's and Sam's' request for prejudgment interest, JA667, which really raised the same issue in reverse. As the court noted, "[p]rejudgment interest serves two purposes: first, it compensates [a party] for the loss of the use of his or her money; and, second, it forces the defendant to relinquish any benefit that it has received by retaining the plaintiff's money in the interim." JA668 (citation omitted). In this somewhat unusual case, where the plaintiffs, if successful, ultimately would be the ones making a net payment to the defendants to purchase the properties at

issue, the court should have considered that the plaintiffs were retaining a benefit by retaining for more than five years the purchase prices that, according to them, should have been paid to Quarterfield in 2019 for the properties. Quarterfield still has not received one penny of that money and, as a result of the court's ruling, will have to return the rent it received since then, which itself represented only a portion of the more than five years this litigation has been pending.[15]

This Court ultimately should reverse the district court's determinations that the purchase options were unconditional and that Walmart and Sam's validly exercised them—that is, the "liability" determinations as to breach of contract— thereby making the district court's damages award for that breach irrelevant. In the event the Court does not reverse on those issues, it should reverse the damages ruling as plain error.

As this Court has explained the standard, it may "exercise [its] discretion to correct a forfeited error, if [it]: (1) find[s] error; (2) find[s] the error is plain; (3) find[s] the error affects the substantial rights of the party or parties alleging the error; and (4) after examining the particulars of the case, [it] find[s] the error seriously

---

[15] And, while the court denied Walmart's and Sam's' requests for prejudgment interest, which is the subject of their cross-appeal, it nevertheless ordered that they were entitled to receive interest that accrued on the rent that they had paid into escrow. JA674-675. It did not afford the same consideration to Quarterfield.

affects the fairness, integrity or public reputation of judicial proceedings." *In re Am. Honda Motor Co., Inc., Dealerships Rels. Litig.*, 315 F.3d 417, 440 (4th Cir. 2003).

It should be plain here that Walmart and Sam's were awarded a far more beneficial damages ruling than they were justly entitled to. That ruling takes no account of the fact that Walmart and Sam's have retained the benefit of a combined $16,867,216.25 (the sum of the purchase prices for the properties) for more than five years while occupying the properties effectively rent-free during that time. This litigation has been pending since 2018 and, according to Walmart and Sam's, closings on conveyances of the properties should have occurred in the spring of 2019. Quarterfield cannot justly be blamed for the time it has taken to bring this case to a conclusion. The ultimate purchase prices paid for the properties, in the event Walmart and Sam's are successful in this appeal, will be even more beneficial to them, because the district court has further ordered that they "shall be entitled, but not obligated," to credit the entire amount of their judgments for rent paid to Quarterfield during the pendency of this litigation, "together with all post-judgment interest," "against the purchase price." JA675. These errors certainly affect Quarterfield's substantial rights, and it is hard to see how these errors do not seriously affect the fairness of this judicial proceeding and the public's perception of it.

Discretion is warranted in this case, and, in the event this Court does not reverse the district court's liability determinations, this Court should nevertheless

reverse the court's disposition of Count III as to damages and other relief as plain error.

## V. The district court erred in ordering that Walmart and Sam's are entitled to an award of attorneys' fees and costs.

Finally, the court erred in ruling that Walmart and Sam's were entitled under the Leases to an award of attorneys' fees and costs. JA675. The district court has deferred ruling on the amount of such fees and costs until after the conclusion of this appeal, JA678, but it should not have determined that Walmart and Sam's are entitled to such an award in the first place.

As with Issue IV, if this Court reverses the district court's liability determinations as to the meaning of Section 27, the ruling on attorneys' fees will be irrelevant. Walmart and Sam's will no longer be the prevailing parties and will not be entitled to an award under their reading of the contracts. But, in the event this Court does not reverse on the other issues, it should nevertheless hold that Walmart and Sam's are not entitled to an award. Whether a party is entitled to an award of attorneys' fees or costs under a contract is an issue of contract interpretation subject to *de novo* review. *Parkway 1046, LLC v. U. S. Home Corp.*, 961 F.3d 301, 312–14 (4th Cir. 2020) (reversing fee award based on meaning of "party" in fee-shifting provision of contract).

The court relied on Section 24(m) of the Leases (as did Walmart and Sam's) in determining an entitlement to a prevailing party fee award. JA670. That provision says:

> (m) Should any legal action be commenced in connection with this Lease, the prevailing party in such action shall be entitled to recover, in addition to court costs, such amount as the court may adjudge as reasonable attorneys' fees.

JA56, JA99. In doing so, the court discounted the fact that this litigation is really about Walmart's and Sam's' asserted rights to purchase the properties and that, although the conditional purchase option is contained in the Leases, the purchase of the properties is governed by separate documents that were appended to the Leases, the Purchase Agreements.[16]

The Purchase Agreements are what the parties agreed would govern any disputes about the purchase of the properties—that is, the exercise of the conditional purchase options—and the court should have applied these more specific agreements to this dispute. Section 27 of the Leases says that "the remainder of the terms and conditions of the purchase and sale of the Premises shall be as set forth in the [Purchase Agreements]" appended to the Leases. JA58, JA101. The Purchase Agreements do not provide for fee-shifting, and in fact say the opposite:

---

[16] The Purchase Agreements attached to each Lease are materially similar to each other for purposes of this appeal.

27. <u>Attorney's Fees; Court Costs</u>.  In any action or proceeding arising out of this Agreement, each party shall bear its own attorney's fees, and the prevailing party shall be entitled to recover only court costs from the non-prevailing party incurred by such party in enforcing its rights hereunder. …

JA78, JA121.

Purchase of the properties pursuant to the Purchase Agreements was the gravamen of the relief Walmart and Sam's requested in their amended complaint. In Count I, they requested a declaration that Section 27 of the Leases was valid and enforceable and that they properly exercised the options, but such rulings were just steps on the way to the ultimate relief they sought. They asked for those rulings to be made "such that they [Walmart and Sam's] possess the right to purchase Plaintiffs' Parcels at the defined prices pursuant to the Purchase Agreements accompanying each of the Leases." JA24. In Count II, they requested a decree of specific performance "directing Defendants to convey the Walmart and Sam's REBT Parcels to Walmart and Sam's REBT, respectfully [*sic*], pursuant to the terms of the Purchase Agreements." JA25.[17] In ruling on the contract interpretation issues, the court granted Walmart and Sam's the relief they requested and issued an Order and Declaratory Judgment in which it "ordered" Quarterfield "to execute the Purchase

---

[17] Walmart and Sam's presumably knew that fee-shifting was not available under the Purchase Agreements, so they requested a fee award "pursuant to the Leases" instead. JA24-26.

Agreement with Walmart and Sam's in accordance with the terms in Section 27 of the lease." JA599.

Although the court found that some of the terms of the Purchase Agreements were also covered in Section 27 of the Leases, and that "the remaining terms of the Purchase Agreement[s] have little to do with Plaintiff's claims," JA671, the reality is that the majority of the terms in the Leases also have little to do with Plaintiff's claims. The parties clearly agreed that each would bear its own attorneys' fees in any action or proceeding arising out of the Purchase Agreements, and this action is about nothing other than the purchase of the properties, which Section 27 said was to occur pursuant to the Purchase Agreements. Indeed, when a court specifically enforces an option contract, "[i]t is not the promise to give an option which is specifically enforced; it is the bilateral contract which arises upon acceptance of the option." *Hyatt v. Romero*, 58 A.2d 899, 902 (Md. 1948). The court should have held that the no-fee-shifting provision in the Purchase Agreements applies to this dispute, and its decision that Walmart and Sam's are entitled to an award of attorneys' fees and costs should be reversed.

## Conclusion

The Court should reverse in all respects and remand for the entry of judgment in Quarterfield's favor.

## Statement Regarding Oral Argument

Quarterfield requests oral argument because it believes the opportunity to clarify and further explain the record and the parties' arguments will be helpful to the Court's consideration of this appeal.

Respectfully submitted:

*/s/ John A. Bourgeois*

John A. Bourgeois
Amy E. Askew
Louis P. Malick
KRAMON & GRAHAM, P.A.
750 East Pratt Street, Suite 1100
Baltimore, Maryland 21202
(410) 752-6030
jbourgeois@kg-law.com
aaskew@kg-law.com
lmalick@kg-law.com

*Counsel for Appellants*
*Quarterfield Partners LLC, et al.*

## Certificate of Compliance

I hereby certify that the foregoing brief complies with: (1) the 13,000 word type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i), in that it contains 12,885 words, excluding the parts exempted by Fed. R. App. P. 32(f); and (2) the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportional typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ John A. Bourgeois*
John A. Bourgeois

*Counsel for Appellants*

**Certificate of Service**

I hereby certify that, on July 31, 2024, I filed this brief using the Court's CM/ECF system, which will cause copies to be served on all counsel of record.

/s/ John A. Bourgeois

John A. Bourgeois

*Counsel for Appellants*