# IN THE
# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

WALMART REAL ESTATE BUSINESS TRUST;
SAM'S REAL ESTATE BUSINESS TRUST,

*Plaintiffs-Appellees,*

v.

QUARTERFIELD PARTNERS LLC;
BL QUARTERFIELD ASSOCIATES LLC;
Q.O.P. PROPERTIES LLC; QUARTERFIELD OFFICE PARK LLC,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT BALTIMORE

## RESPONSE BRIEF OF APPELLEES

Donald A. Rea
LAW OFFICES OF DONALD A. REA LLC
2316 Cavesdale Road
Owings Mills, MD 21117
410-905-4656
don@donrealaw.com

*Counsel for Appellees*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

## DISCLOSURE STATEMENT

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. __24-1355__    Caption: __Walmart Real Estate Business Trust et al. v. Quarterfield Partners...__

Pursuant to FRAP 26.1 and Local Rule 26.1,

Walmart Real Estate Business Trust
(name of party/amicus)

Sam's Real Estate Business Trust

who is ____Plaintiffs - Appellees____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)

1. Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2. Does party/amicus have any parent corporations?  ☑YES ☐NO
   If yes, identify all parent corporations, including all generations of parent corporations:

   Wal-Mart Property Co., Wal-Mart Stores East, LP, WSE Management, LLC, WSE Investment, LLC, Wal-Mart Stores East, LLC, and Walmart Inc.

   Sam's Property Co., Sam's East, Inc., Sam's West, Inc. and Walmart Inc.

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?  ☐YES ☑NO
   If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation? ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _____    Date: _____May 7, 2024_____

Counsel for: Plaintiffs - Appellees

Print to PDF for Filing

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. iii

ISSUES PRESENTED .......................................................................1

STATEMENT OF THE CASE ............................................................1

    I.    The Purchase Option ................................................................1

    II.   The Option Term .....................................................................3

    III.  Reimbursement of Rent Paid to Quarterfield After the Intended Closing Dates of the Properties' Purchases.................................7

    IV.  Walmart's Attorneys' Fees and Costs .......................................8

SUMMARY OF ARGUMENT ..........................................................10

ARGUMENT ...................................................................................13

    I.    The Clear and Unambiguous Language of Section 27 Grants Walmart an Unconditional Purchase Option............................13

        A. Section 27 is not a "conditional option." ...........................14

        B. The Purchase Option is not a right of first refusal that can be nullified by the owner's decision not to sell .......................19

        C. Quarterfield's interpretation of the Purchase Option would render the option grant illusory ..........................................22

    II.   The District Court Correctly Held that Quarterfield Breached Its Obligation to Provide the Option Notices ...............................24

    III.  The District Court Correctly Determined that the Option Term Is Measured from the Rent Commencement Date of the Lease .................28

IV.     The District Court Correctly Reimbursed Walmart and Sam's for
        Rent Paid After the Dates on Which They Should Have Owned
        Each Property ............................................................................32

V.      Walmart Is Entitled to Attorneys' Fees and Costs Under the
        Expressed Terms of the Lease..................................................34

CONCLUSION................................................................................................37

CERTIFICATE OF COMPLIANCE.......................................................38

CERTIFICATE OF SERVICE .................................................................39

# TABLE OF AUTHORITIES

## Cases

*Affable Servs., LLC v. C-Care LLC,*
No. 19-02877-SAG, 2020 WL 1675920 (D. Md. Apr. 6, 2020) .......... 22, 24, 27

*Ayres v. Townsend,*
598 A.2d 470 (Md. 1991) ............................................................... 20, 36

*Baltimore/Washington Constr. & Pub. Emp. Laborer's Dist. Council v.*
*Whiting-Turner Contracting Co.,*
244 F. Supp. 3d 490 (D. Md. 2017) ..................................................... 24

*Beall v. Beall,*
434 A.2d 1015 (Md. 1981) ................................................................... 2

*Bindagraphics, Inc. v. Fox Grp., Inc.,*
377 F. Supp. 3d 565 (D. Md. 2019) .............................................. 23, 24

*Brethren Mut. Ins. Co. v. Buckley,*
86 A.3d 665 (Md. 2014) ..................................................................... 17

*Calomiris v. Woods,*
727 A.2d 358 (Md. 1999) ................................................................... 28

*Chorley Enterprises, Inc. v. Dickey's Barbecue Restaurants, Inc.,*
807 F.3d 553 (4th Cir. 2015), *cert denied,* 578 U.S. 940, 136 S. Ct. 1656,
194 L. Ed.2d 800 (2016) ............................................................... 13-14

*City of Baltimore v. Indus. Elecs., Inc.,*
186 A.2d 469 (Md. 1962) ................................................................... 17

*Clancy v. King,*
954 A.2d 1092 (Md. 2008) ................................................................. 27

*Cole v. State Farm Mut. Ins. Co.,*
753 A.2d 533 (Md. 2000) ................................................................... 30

*Credible Behavioral Health, Inc. v. Johnson,*
220 A.3d 303 (Md. 2019) .............................................................. 17, 25

*David A. Bramble, Inc. v. Thomas,*
914 A.2d 136 (Md. 2007) ................................................................... 20

*Dialist Co. v. Pulford,*
399 A.2d 1374 (Md. App. 1979) ......................................................... 33

*dmarcian, Inc. v. dmarcian Eur. BV*,
  60 F.4th 119 (4th Cir. 2023) ............................................................ 17

*EBC Properties, LLC v. Urge Food Corp.*,
  290 A.3d 1053 (Md. App. 2023) ....................................................... 17

*Emcor Grp., Inc. v. Great Am. Ins. Co.*,
  No. 12-0142-ELH, 2013 WL 1315029 (D. Md. Mar. 27, 2013) ...................... 30

*Fishman v. LaSalle Nat'l Bank*,
  247 F.3d 300 (1st Cir. 2001) .......................................................... 17

*Iglehart v. Jenifer*,
  371 A.2d 453 (Md. App. 1977), *cert denied,* 280 Md. 732 (Md.) ............... 20

*Johnson v. Oroweat Foods Co.*,
  785 F.2d 503 (4th Cir. 1986) ...................................................... 32, 33

*National Micrographics Sys., Inc. v. OCE-Indus., Inc.*,
  465 A.2d 862 (Md. App. 1983), *cert. denied*, 470 A.2d 353
  (Md. 1984) ............................................................................... 33

*Ocean Petroleum, Co.*,
  5 A.3d 683 (Md. 2010) ................................................................. 25

*Owens-Illinois, Inc. v. Cook*,
  872 A.2d 969 (Md. 2005) .............................................................. 16

*Pacific Indem. Co. v. Interstate Fire & Cas. Co.*,
  488 A.2d 486 (Md. 1985) .............................................................. 25

*Prince George's Cnty. v. Silverman*,
  472 A.2d 104 (Md. App. 1984) ......................................................... 2

*Questar Builders, Inc. v CB Flooring, LLC*,
  978 A.2d 651 (Md. 2009) ..................................................... 22, 23, 24

*Sierra Club v. Dominion Cove Point LNG, L.P.*,
  86 A.3d 82 (Md. App. 2014), *cert denied,* 93 A.3d 289 (Md.) ................ 14

*Straley v. Osborne*,
  262 Md. 514 (1971) ................................................................. 20, 21

*Westpark, Inc. v. Seaton Land Co.*,
  171 A.2d 736 (Md. 1961) ............................................................ 20, 21

Appellees Walmart Real Estate Business Trust and Sam's Real Estate Business Trust[1] respectfully submit the following brief in opposition to Appellants Quarterfield Partners LLC, BL Quarterfield Associates LLC, Q.O.P. Properties LLC, and Quarterfield Office Park LLC's (collectively, "Quarterfield") opening brief.

## ISSUES PRESENTED

I.    Did the district court correctly enforce the Purchase Option in the Lease?

II.   Did the district court correctly reimburse Walmart for rent paid after title to the property should have been transferred?

III.  Did the district court correctly find Quarterfield liable for Walmart's attorneys' fees and costs under the express terms of the Lease?

## STATEMENT OF THE CASE

Walmart hereby supplements Quarterfield's statement of the case.

## I.    The Purchase Option.

Section 27 of the Lease provides in pertinent part that "[f]rom the end of the tenth (10th) year of this Lease until the end of the eleventh (11th) year of this Lease (the 'Option Term'), Lessor hereby grants to Lessee an option to purchase the Premises from Lessor on the terms and conditions set forth herein (the 'Option')." JA58 & JA100-101.   The district court held that the "plain and unambiguous

---

[1] Since Walmart and Sam's Leases are identical in all material respects, this brief shall refer to them collectively as Walmart, the "Lease" and the "Purchase Option," where appropriate.

language of the lease grants [Walmart and Sam's] an option to purchase the land they are leasing." JA583. The court explained that the "only reasonable interpretation of this sentence is that Quarterfield, the lessor, 'grant[ed]' Walmart and Sam's, the lessees, 'an option to purchase the Premises' from Quarterfield 'on the terms and conditions set forth herein.'" JA583. The court also reasoned that the remaining terms and conditions for exercising the option and attachment of a purchase agreement to the Lease "further support[] the plain and unambiguous reading of the first sentence." JA583. The court, therefore, concluded:

> Read in its entirety and giving the language its customary, ordinary, and accepted meaning, Section 27 of the lease clearly contemplated that Walmart and Sam's would have an option to purchase the properties during an option term after receiving notice of the option term from Quarterfield, and if Walmart and Sam's elected to exercise the option, the parties were obligated to negotiate in good faith a sale of the properties. The legal effect of the unambiguous contract language that "Lessor hereby grants to Lessee an option to purchase the Premises" is that Quarterfield gave Walmart and Sam's a "continuing offer to sell . . . which is irrevocable during the stated period." *Prince George's Cty. v. Silverman*, 472 A.2d 104, 111 (Md. App. 1984) (citing *Beall v. Beall*, 434 A.2d 1015 (Md. 1981)).

JA584.

Section 27 also contains the following "Option Notice" requirements:

> Notwithstanding the foregoing, the Option Term shall not commence until Lessor sends to Lessee two (2) thirty (30) day notices of the commencement of the Option (the "Option Notice"). In the event Lessor fails to send such

notice at the end of the ninth (9th) year of this Lease, then the Option Term shall be moved such that it is for a one year period commencing thirty (30) days after the Second Option Notice has been received by Lessee. Lessee may exercise the option to purchase the Premises by providing thirty (30) days' notice to Lessor of its election to exercise the Option (the "Option Notice"). JA58; JA100-101.

With respect to the Option Notices required of Quarterfield, the district court explained the effect of the phrase "[n]otwithstanding the foregoing":

> Although the sentence begins with "Notwithstanding the foregoing," the language that follows does not limit the option to purchase that was granted in the first sentence or make it dependent on Quarterfield's decision to sell. Rather, the second sentence confirms that the parties intended that there would, in fact, be an Option Term but it would not commence until the notices were sent. Quarterfield's interpretation of the second sentence, on which its case largely rises and falls, does not square with the text.

JA585. Thus, the court held that the "option clause's second sentence cannot be interpreted to alter the plain and unambiguous language in the preceding sentence that Quarterfield 'hereby grant[ed]' Walmart and Sam's 'an option to purchase the Premises from [Quarterfield].'" JA585.

## II.    The Option Term.

The parties below disputed how to determine the tenth and eleventh years of the Lease for purposes of ascertaining the Option Term. Quarterfield argued that the first year of the Lease began at the "Effective Date." Walmart argued that it began on the "Rent Commencement Date."

Quarterfield also notes that pertinent terms such as "Initial Term," "Effective Date," and "Rent Commencement Date" are defined in the Lease. Apps.' Br. 4-5; *see* JA43-44 & JA86-87 (Lease § 2(b) (rent); (c) (Initial Term)). Quarterfield acknowledges that the Initial Term of the Lease runs for twenty years after the Rent Commencement Date. Apps.' Br. 4.

The Rent Commencement Date was the date that Walmart opened for business and began paying substantial rent, which was March 5, 2008. JA140. The three-year period of time prior to the Rent Commencement Date was a "Study Period" during which Walmart only paid nominal rent of $100 per month and had the right to terminate the Lease in its sole discretion. JA51-52 & JA94-95 (Lease § 19); JA140 & JA143. The Rent Commencement Date signals the beginning of the initial 10-year term of the Lease once the Study Period is complete. JA44 & JA87 (Lease § 2(c)). Thereafter, Walmart paid $772,021.34 per year and Sam's paid $619,524.00 per year in rent. JA45 & JA87.

The Lease defines the "Option Term" in section 27 as the period "[f]rom the end of the tenth (10th) year of this Lease until the end of the eleventh (11th) year of this Lease." JA58 & JA101. The Lease does not define when or how a particular "year of this Lease" is determined, and thus does not explain how to identify the tenth or eleventh "year of this Lease." *See* JA42 & JA85 (defining the "Lease" only as "this ground lease"). Nor does the Lease utilize either the Effective Date, Rent

Commencement Date, or Initial Term to elucidate when the Option Term commences.

Quarterfield notes that Rent Commencement Date is not used in the Option Term contained in the Purchase Option.[2] Apps.' Br. 5. However, neither does the provision use the term "Effective Date." *See* JA42 & JA85. The Purchase Option only refers to the Initial Term by way of example to illustrate how to calculate the purchase price for the property. *See* JA42 & JA85. The Initial Term is not used to calculate particular years of the Lease in order to determine when the Option Term commences or ends.

Consequently, the district court held:

> [T]he lease is ambiguous as to when the option term began, but after consideration of extrinsic evidence, the Court finds that the option term began at the end of the tenth year after the date the stores opened for business and plaintiffs began paying defendants significant annual rent.

JA574. The court also found that "based on the unambiguous language of the lease, Quarterfield was obligated to send plaintiffs notices of the commencement of the option term, but it failed to do so, in breach of the lease." JA574. Therefore, the court considered "ample extrinsic evidence" presented by Walmart "that shows the parties[] intended that the timing of the Option Term should be calculated using the Rent Commencement Date." JA592.

---

[2] Capitalized terms used in this brief are identified as such in the Lease.

First, the parties exchanged letters of intent during lease negotiations in which "both sides proposed that the tenant 'shall have a one-time option to purchase the Property' and that 'Landlord will deliver notice to Tenant . . . prior to the end of the 10th anniversary of the Rent Commencement.'" JA592 (quoting JA189 & JA201). The court found that "[n]one of the letters of intent contemplated calculating the commencement of the 'one-time option to purchase' from the date the ground lease was signed." JA592.

Next, the parties executed a Short Form Lease and Memorandum of Option (the "Short Form Lease") during the preliminary Study Period of the Lease, which explains the Option Term:

> In the Lease the Lessor also grants the Lessee an option to purchase the Premises at a purchase price set forth in the Lease between the tenth (10th) and eleventh (11th) lease year. The Lease year shall begin on the Rent Commencement Date, as defined in the Lease, which is on or before the date on which the Lessee first conducts regular business on the premises.

JA128 & JA593. The court found that "[a]lthough these documents state that the 'Short Form Lease shall be used only for recording purposes and shall not supersede, amend nor replace any covenants of the Lease,' they may serve as extrinsic evidence to define the terms in the lease." JA593.

The court also considered the testimony of Quarterfield's corporate designee, Brett Guy, in connection with commencement of the Option Term. *See* JA594-595.

Mr. Guy testified that the landlord did not want to sell the properties to Walmart, because it considered renting the properties more profitable. JA594 (quoting JA177). The district court held that his testimony is consistent with the other "extrinsic evidence that the parties understood the Option Term would not begin until ten years after the businesses were operational [*i.e.,* the Rent Commencement Date]. This timing would ensure that Quarterfield received ten years of significant rental income before Walmart and Sam's could purchase the properties." JA594.

## III. Reimbursement of Rent Paid to Quarterfield After the Intended Closing Dates of the Properties' Purchases.

In a subsequent memorandum opinion, the district court addressed Walmart's supplemental motion for summary judgment regarding damages for Quarterfield's breach of the Lease. JA662. Specifically, Walmart claimed entitlement to reimbursement for rent paid after the dates on which title to each of the properties should have been conveyed. JA666-667. After adopting and incorporating Judge Boardman's prior holding that Quarterfield breached the Lease, Judge Sullivan held that Walmart was entitled to reimbursement for the rent paid after Quarterfield should have transferred title to the properties. JA666-667.

The Purchase Agreement (attached to the Lease as *Exhibit J*) establishes the intended closing dates for Walmart and Sam's purchases:

> <u>Closing.</u> Closing shall occur at a place and time mutually agreed upon by the parties, on or before the later of (a) sixty (60) days following the expiration of the Feasibility

> Period or (b) thirty (30) days after Purchaser's receipt of
> all of the Governmental Approvals, as defined in Section
> 16 (the "Closing").

JA665 (quoting JA77). After calculating the governing timeframe for the Feasibility

Period for the individual purchases, the court held that "Walmart would have owned

its property on January 17, 2019, and Sam's would have owned its property on May

24, 2019." JA666. Walmart and Sam's continued to pay rent to Quarterfield from

their anticipated closings date until September 2020, when rent was paid into escrow

accounts per agreement of the parties. JA666. Thus, the court awarded Walmart

$1,315,756.77, the amount of rent it paid directly to Quarterfield plus the contents

of the rent escrow account. JA667. The court awarded Sam's $837,689.71 and the

contents of its rent escrow account on the same basis. JA667-670. The court

declined to award prejudgment interest on the rent Walmart or Sam's paid to

Quarterfield. JA667.

## IV. Walmart's Attorneys' Fees and Costs.

Finally, the court found Quarterfield liable for Walmart's attorneys' fees and

costs as the prevailing party pursuant to Section 24 of the Lease, which provides:

> Should any legal action be commenced in connection with
> this Lease, the prevailing party in such action shall be
> entitled to recover, in addition to court costs, such amount
> as the court may adjudge as reasonable attorneys' fees.

JA670-671.[3]  With respect to the application of a countervailing attorney-fee clause in the Purchase Agreement providing for each party to bear its own fees and costs with respect to the purchase transaction, the court reiterated that Judge Boardman had previously held:

> Quarterfield was obligated *under the lease* to provide Walmart and Sam's with notices of the option [to purchase the properties]. By refusing to issue the notices and refusing to negotiate the sale of the properties as they were required to *do under the lease*, Quarterfield *has breached the lease*. The Court will grant plaintiffs' motion as to [Plaintiffs' claim for specific performance] and order that Quarterfield execute the Purchase Agreement in accordance with *Section 27 of the lease.*

JA671 (quoting JA597-598) (emphasis in original).

The court's damages opinion reasons that although the Lease incorporates the Purchase Agreement, Walmart's "claims arise from Quarterfield's refusal to issue the notices required by the leases and its refusal to sell the properties to Plaintiffs after Plaintiffs sent notice of their intent to exercise the purchase options."  JA671. The "remaining terms of the Purchase Agreement have little to do with [those] claims."  Thus, the court "reject[ed] Quarterfield's interpretation of the Purchase Agreements' attorney-fee prohibition as controlling over the cost-shifting provision

---

[3] The court deferred addressing the amount of those fees and costs until this appeal is resolved. JA678.

in Section 24(m) of the leases. Plaintiffs' claims arise from Quarterfield's breach of Section 27 of the leases." JA671.

## SUMMARY OF ARGUMENT

This appeal concerns a straightforward Purchase Option in a Lease. The provision's clear and unambiguous language grants Walmart the unconditional right to exercise the Purchase Option during the eleventh year of Lease. The provision also requires Quarterfield to provide Walmart with two Option Notices. The Lease provides that the Option Term is postponed if Quarterfield "fails" to provide the notices. The Option Notices are an obligation of Quarterfield to remind Walmart, for its benefit, that the Option Term has commenced. It does not confer upon Quarterfield an atextual right to nullify Walmart's Purchase Option. Quarterfield's argument on this point contorts the option language into a construct that defies common sense and the canons of contract interpretation. Therefore, the district court held that Quarterfield breached its obligation to send the required notices, and Walmart properly exercised its option despite that breach.

Walmart exercised the Purchase Option in a timely manner. The district court properly held that the Option Term regarding the eleventh "year of this Lease" is susceptible to more than one interpretation. Quarterfield argues that Lease years should be counted from the Effective Date when the Lease was signed. Walmart contends that Lease years should be counted from the Rent Commencement Date

when the initial Study Period under the Lease ended, the store began operations and significant monthly rent started.

Having found that the Option Term is ambiguous, the court looked to extrinsic evidence to resolve the ambiguity (not to contradict or change its terms). Walmart presented substantial extrinsic evidence including Letters of Intent from each party, a Short Form Lease and Memorandum of Option, and the testimony of Quarterfield's corporate designee. Quarterfield presented none. All of the extrinsic evidence made clear that the "years of this Lease" are counted from the Rent Commencement Date not the Effective Date. Consequently, Walmart exercised its option in a timely manner despite Quarterfield's breach. In any event, this debate is a moot point inasmuch as Quarterfield breached the Option Notice requirements thereby extending the commencement of the Option Term.

The district court also correctly found that Walmart was entitled to reimbursement of the rent paid to Quarterfield after title to the properties should have been transferred. Quarterfield's contention that this reimbursement constitutes a windfall is without merit. If the properties were transferred in 2019 as they should have been (*i.e.,* if Quarterfield had not breached the Leases), then neither Walmart nor Sam's would have continued to pay rent. Moreover, Walmart and Sam's would have paid Quarterfield the agreed-upon purchase price for each property and will do so (taking into accounts the credits that the district court found on Walmart's behalf)

when the properties are conveyed.  Therefore, the district court awarded Walmart and Sam's the rent they paid to Quarterfield after the dates on which title to the properties should have been conveyed.  The district court's ruling places the parties in precisely the position they would have occupied if Quarterfield had not breached the Leases.

Finally, Quarterfield's claim that Walmart is not entitled to attorneys' fees and costs as the prevailing party under the express terms of the Lease is without merit. Quarterfield claims that this litigation is actually about a breach of the Purchase Agreement, not the Lease.  That allegation is belied by the district court's orders, virtually every pleading, and all the evidence and arguments presented by both parties.  Walmart's amended complaint sought a declaratory judgment enforcing the Purchase Option in Section 27 of each Lease and an order of specific performance directing Quarterfield to convey the properties pursuant to that Purchase Option. Walmart claimed that Quarterfield breached the Lease, and the district court so held in its various summary judgment rulings.  Walmart never claimed that Quarterfield breached the Purchase Agreements, which the parties have not yet even signed.

# ARGUMENT

## I. The Clear and Unambiguous Language of Section 27 Grants Walmart an Unconditional Purchase Option.

The operative language of the Purchase Option contained in Section 27 of the Lease provides:

> From the end of the tenth (10th) year of this Lease until the end of the eleventh (11th) year of this Lease (the "Option Term"), Lessor hereby grants to Lessee an option to purchase the Premises from Lessor on the terms and conditions set forth herein (the "Option"). Notwithstanding the foregoing, the Option Term shall not commence until Lessor sends to Lessee two (2) thirty (30) day notices of the commencement of the Option (the "Option Notice"). In the event Lessor fails to send such notice at the end of the ninth (9th) year of this Lease, then the Option Term shall be moved such that it is for a one year period commencing thirty (30) days after the Second Option Notice has been received by Lessee. Lessee may exercise the option to purchase the Premises by providing thirty (30) days' notice to Lessor of its election to exercise the Option (the "Option Notice"). JA58; JA100-101.

The district court held, "[h]aving "reviewed the lease and the record," "the plain and unambiguous language of Section 27 of the lease grants Walmart and Sam's an enforceable option to purchase the property during the option term." JA626.

The parties both contend that this language is clear and unambiguous, but they propose different unambiguous meanings. *See* Apps.' Br. 14-15. *See also Chorley Enterprises, Inc. v. Dickey's Barbecue Restaurants, Inc.,* 807 F.3d 553, 563 (4th Cir. 2015), *cert denied,* 578 U.S. 940, 136 S. Ct. 1656, 194 L. Ed.2d 800 (2016) (citing

*Sierra Club v. Dominion Cove Point LNG, L.P.,* 86 A.3d 82, 89 (Md. App. 2014), *cert denied,* 93 A.3d 289 (Md.) (stating that "the mere fact that the parties disagree as to the meaning does not necessarily render [a contract] ambiguous" when it could only have one meaning as a matter of law)).

### A. Section 27 is not a "conditional option."

Quarterfield contends that Section 27 only grants Walmart a "conditional option to purchase the property during an Option Term that would not commence until [Quarterfield] sent certain notices of its commencement." Apps.' Br. 11. According to Quarterfield's theory, if it chose not to provide the Option Notices required by Section 27, the Option Term would never commence and Walmart would lose all rights to purchase the property. *Id.* at 15. In other words, Quarterfield claims that the provision requiring it to provide notice that the Option Term has commenced confers on it an absolute, unilateral right to abrogate the option. *Id.* at 11 & 15. Quarterfield argues that this reading is necessary to avoid turning the phrase "[n]otwithstanding the foregoing" into "meaningless surplusage." *Id.* at 16. Quarterfield is incorrect.

This argument is contrary to the plain language of the Purchase Option. The first sentence of the Purchase Option expressly grants Walmart "an option to purchase the Premises from Lessor on the terms and conditions set forth herein." JA58 & JA100-101. The sentence also states when the "Option Term" begins and

ends, namely on the tenth and eleventh anniversaries of the Lease, respectively. JA58 & JA100-101.

The second sentence states that "[n]otwithstanding the foregoing, the Option Term shall not commence until [Quarterfield] sends" two required Option Notices to Walmart. By its terms, this "[n]otwithstanding" sentence qualifies the time when the Option Term commences, not whether it is granted at all. Finally, the third sentence postpones commencement of the Option Term if the "Lessor <u>fails</u> to send such notice." JA58 & JA101 (emphasis added). The plain language of the "[n]otwithstanding" phrase demonstrates that it only suspends commencement of the Option Term if Quarterfield "fails" to provide the required Option Notices. The phrase only affects the Option Term not the substantive grant of the Purchase Option altogether. The Option Notices are clearly intended to preserve Walmart's option rights, not frustrate them.

Moreover, the Option Notices are obligations that Quarterfield agreed to undertake, not rights to be unilaterally exercised in a manner that extinguishes Walmart's express rights. The Purchase Option says nothing at all about Quarterfield having the right or discretion to withhold the Option Notices. The notice provisions clearly are not intended to permit Quarterfield any discretion to revoke Walmart's option. To the contrary, the very fact that the parties agreed to

characterize them as "notices" of an expressly conferred right makes clear that their purpose was to *benefit* Walmart by alerting it to the onset of the option period.

This interpretation is further bolstered by the very next sentence, which states that "Lessee may exercise the option to purchase the Premises by providing thirty (30) days' notice to Lessor of its election to exercise the Option (the "Option Notice")." JA58 & JA101. The exercise of Lessee's option does not state that it is conditioned on Lessor choosing whether or not to provide the Option Notices.

Reading the provision as a whole makes unmistakably clear that the purpose of the Option Notice requirements in the "[n]otwithstanding" sentence is to require Quarterfield to remind Walmart when the Option Term commences so it would not overlook its right to exercise the option. Quarterfield's contention that the sentence confers an unfettered right on it to negate the Purchase Option by "fail[ing]" to provide the Option Notices is incompatible with the plain language of the paragraph as a whole and its obvious meaning and purpose. *See Owens–Illinois, Inc. v. Cook*, 872 A.2d 969, 985–86 (Md. 2005) ("In seeking to discern the parties' intention, we construe the contract as a whole, giving effect to every clause and phrase, so as not to omit an important part of the agreement.") (citations omitted).

If the notice provisions were intended to confer rights upon Quarterfield to preempt the Purchase Options, they would not have been worded as requirements. The section would not have called the non-provision of the notices "fail[ures]"; it

would have affirmatively stated that they were elective at Quarterfield's discretion and that an election not to send them would mean that the lessee would not be able to exercise the conferred option rights. A commonsense reading of the entire provision in its proper context demonstrates that the Option Notice requirement exists for the benefit of Walmart so the Option Term would not pass without it knowing.

Quarterfield's construction of the Purchase Option overlooks the most fundamental principle of contract interpretation. "As a bedrock principle of contract interpretation, Maryland courts consistently strive to interpret contracts in accordance with common sense." *EBC Properties, LLC v. Urge Food Corp.,* 290 A.3d 1053, 1066 (Md. App. 2023) (quoting *Credible Behav. Health, Inc. v. Johnson*, 220 A.3d 303, 313 (Md. 2019) in turn quoting *Brethren Mut. Ins. Co. v. Buckley*, 86 A.3d 665, 674 (Md. 2014)) (internal quotation marks omitted). Thus, the "rule to be applied is that an interpretation which makes a contract fair and reasonable will be preferred to one leading to a harsh or unreasonable result, so that a reading which produces a forfeiture will not be favored." *City of Balt. v. Indus. Elecs., Inc.*, 186 A.2d 469, 471 (Md. 1962). Common sense "'is as much a part of contract interpretation as is the dictionary or the arsenal of canons.'" *dmarcian, Inc. v. dmarcian Eur. BV,* 60 F.4th 119, 144 (4th Cir. 2023) (quoting *Fishman v. LaSalle Nat. Bank*, 247 F.3d 300, 302 (1st Cir. 2001)).

Quarterfield's interpretation of Section 27 jettisons common sense in favor of an unreasonable interpretation that affords it rights and discretion that are not granted by the clear language of the Lease. Quarterfield bases its contention that the Purchase Option is "conditional" on a misreading of the phrase "[n]otwithstanding the foregoing." Quarterfield argues that "[n]otwithstanding the foregoing" actually grants them the right to revoke Walmart's option altogether. Quarterfield's interpretation produces a forfeiture of Walmart's option rights that is disfavored by Maryland law.

Quarterfield also claims that construing the notice provision as conferring a unilateral right to nullify the Purchase Option is analogous to other "unilateral rights" granted to Walmart in the Lease, including its right to terminate the Leases during an initial Study Period. *See* Apps.' Br. 24. But these other provisions prove the opposite. Unlike the references to notices in the option provision, those other provisions clearly and unequivocally state affirmative rights of the parties, precisely like the parties would have done here if they had meant to permit Quarterfield to nullify the option at its whim. *See* JA42 & JA85, Lease § 1 ("Lessee acknowledges and agrees that Lessor shall have the *right to grant* to the Other Occupants the right to use the Common Areas") (emphasis added); JA47 & JA90 § 6 ("Lessee *shall also have the right*, at Lessee's sole cost and expense, to install on the exterior elevations of any building on the Premises its standard sign and logo") (emphasis added); JA49

& JA92 § 12 ("Lessor and Lessee *each reserve the right* to grant reasonable easements on, over and under the Premises") (emphasis added); JA50 & JA93 § 16 ("if Lessor fails to pay the costs so invoiced [in connection with a Lessor default], Lessee *shall have the right* to deduct such costs" from a portion of the rent) (emphasis added). *See also* JA42 & JA85, Lease § 1 ("Lessor agrees not to amend or modify the Declaration without Lessee's prior written consent which shall be in *Lessee's sole and absolute discretion*") (emphasis added); JA43-44 & JA86-87 § 2(b) (B) (Lessee's "sole discretion" regarding development permits and approvals for the Premises); JA47 & JA90 § 6 (Lessee's "sole discretion" to raze the building); JA51-52 & JA94-95 § 19 (repeatedly referring to Lessee's "sole discretion" regarding termination for failure to obtain certain licenses). Thus, where the Lease intended to confer "rights" or provide a party with "sole discretion," it stated as much in clear and express terms.

The district court correctly found that the clear and unambiguous terms of the Lease provided Walmart with a Purchase Option, and the "[n]otwithstanding" phrase did not nullify that option. Its decision in this regard should be affirmed.

## B. The Purchase Option is not a right of first refusal that can be nullified by the owner's decision not to sell.

Quarterfield contends that the Purchase Option should be deemed "conditional options," a term exclusively reserved for rights of first refusal. *See* Apps.' Br. 19-21. No Maryland case examines a so-called "conditional option" to

purchase real estate outside of the context of a right of first refusal, and the sole case Quarterfield cites for this idea concerns only a right of first refusal. *See* Apps.' Br. 19-21 (citing *Straley v. Osborne,* 262 Md. 514 (1971). *See also David A. Bramble, Inc. v. Thomas*, 914 A.2d 136, 143 (Md. 2007) (contrasting a purchase option with a right of first refusal referred to as a "preemptive option" or "conditional option"); *Ayres v. Townsend*, 598 A.2d 470, 474 (Md. 1991) (citing *Straley*); *Westpark, Inc. v. Seaton Land Co.,* 171 A.2d 736, 742-43 (Md. 1961) (first recognizing rights of first refusal); *Iglehart v. Jenifer,* 371 A.2d 453, 453 n.1 (Md. App. 1977), *cert denied,* 280 Md. 732 (Md.) (differentiating between the legal effect of a traditional option and a right of first refusal, "calling the latter a pre-emption"). The Purchase Option at issue in this appeal clearly is not a right of first refusal conditioned on the owner's decision to sell.

A right of first refusal is a specific type of option in Maryland that is obviously conditioned on an owner's decision to sell the property. The *Straley* case Quarterfield cites in support of applying a generalized concept of "conditional options" to this option language concerns only the enforcement of a right of first refusal or so-called "first option." *See Straley v. Osborne,* 262 Md. 514 (1971), *cited in* Apps.' Br. 19-21. There, the Maryland Court of Appeals held that a lessee was not entitled to set aside the lessor's sale of the property to a third party because the lessee failed to exercise its right of first refusal before the sale. *Id.* at 526. In this

singular context, the court distinguished between a "true option" that "is a continuing and irrevocable offer by the optionor, which cannot be withdrawn by him during the stated period," and "what has been termed a right of first refusal, a first option, *conditional option*, or first privilege of purchase." *Id.* at 521-22 (emphasis added).

The *Straley* court also discussed *Westpark, Inc. v. Seaton Land Company,* 171 A.2d 736 (Md. 1961), the first case in which Maryland recognized the concept of a right of first refusal. The *Straley* Court concluded that "[i]n Westpark, as in the case at bar, the holders of the 'right' possessed no absolute power to require the property owner to sell at any time-in both instances, whatever rights they had were conditioned upon the owners' decision to sell the property." *Straley,* 262 Md. at 522. Therefore, "[a]ccording to the terms of the lease, Straley only had the right, by whatever name designated, of having the first opportunity to purchase the demised property in the event that Haugh decided to sell." *Id.* at 523.

This line of cases has no application here, where there is no language stating any right of first refusal or right of the lessor to refuse to permit exercise of the option. The *Straley* court did not recognize or even discuss any general category of "conditional options" outside of an express right of first refusal.[4] And Maryland has not expanded the concept of a conditional option beyond a right of first refusal in

---

[4] The only time *Straley* even uses the phrase "conditional option" is merely as an explanatory modifier for a right of first refusal. *See Straley v. Osborne,* 262 Md. 514, 522 (1971).

the more than 50-year period since *Straley* was decided. Even if the concept were generally accepted outside of the singular context of a right of first refusal, the instant option is not "conditional" for all of the reasons discussed above. Quarterfield's attempt to shoehorn a straightforward Purchase Option into a right of first refusal as a "conditional option" should be rejected.

## C. Quarterfield's interpretation of the Purchase Option would render the option grant illusory.

The district court correctly concluded that Quarterfield's contention that it unilaterally controlled whether to allow the Option Term at all by indefinitely withholding the Option Notices would render the Purchase Option illusory. It explained:

> Indeed, "[a]n unlimited right to determine how to perform, or whether to perform at all, negates the promise to perform." *Id.* (quoting *Questar Builders, Inc. v. CB Flooring, LLC*, 978 A.2d 651, 670 (Md. 2009)). Courts disfavor interpretations that render a contract illusory and will "generally prefer a construction which will make the contract effective rather than one which will make it illusory or unenforceable." *Affable Servs., LLC v. C-Care LLC*, No. SAG-19-02877, 2020 WL 1675920, at *4 (D. Md. Apr. 6, 2020) (quoting *Questar Builders*, 978 A.2d at 670).

JA586. (additional citations omitted).

Quarterfield's contention that the Purchase Option is entirely within its sole discretion to honor or not presents a particularly stark example of an illusory promise. Its view that it possesses an unlimited right to determine how to perform,

or whether to perform at all, negates its promise to perform altogether. *Bindagraphics, Inc. v. Fox Grp., Inc.*, 377 F. Supp.3d 565, 575 n.5 (D. Md. 2019) (citing *Questar Builders, Inc. v. CB Flooring, LLC*, 978 A.2d 651, 670 (Md. 2009)). Under Quarterfield's incorrect reading, it could decide at any point whether it desired to sell the properties without ever executing the purchase option, a choice it obviously could make without the parties ever agreeing to mention an option at all. If the parties truly had intended to grant Quarterfield an unfettered right to decide when and if it would sell its properties, there would have been no reason to include the option provision in the Lease. Quarterfield's reading would thus render the option entirely superfluous and illusory.

To the contrary, Quarterfield not only granted Walmart a Purchase Option to be exercised during the eleventh year of the Lease, but it also agreed at the inception of the Lease to a specific formula for the price of the property eleven years down the road. This elaborate pricing agreement would make no sense if Quarterfield could simply withhold formal notices and negotiate the same sale on entirely different pricing terms. Quarterfield also agreed to specific timetables for settlement of the purchase and included a detailed Purchase Agreement with the Lease. The district court correctly concluded that all of these terms would be rendered meaningless if Quarterfield could simply ignore them, or demand new terms *ab initio* at its unilateral election by withholding notice.

In short, Quarterfield's interpretation contravenes long-established principles of Maryland contract law, defies common sense, and renders the grant of the option in Section 27 of the Lease illusory. *See Questar Builders*, 978 A.2d at 670), *quoted in Affable Servs., LLC v. C-Care LLC*, 2020 WL 1675920, at *4 (D. Md. Apr. 6, 2020); *see also Bindagraphics*, 377 F. Supp. 3d at 575 n.5; *Baltimore/Washington Constr. & Pub. Emp. Laborer's Dist. Council v. Whiting-Turner Contracting Co.*, 244 F. Supp.3d 490, 497 (D. Md. 2017) (noting "the common law principle to prefer an interpretation that makes the contract effective rather than one rendering it illusory and unenforceable"). The district court interpreted the Purchase Option in a manner consistent with enforcing the actual grant bestowed by Quarterfield and its decision should be affirmed.

## II. The District Court Correctly Held that Quarterfield Breached Its Obligation to Provide the Option Notices.

The district court held that Quarterfield breached the Leases by failing to provide the Option Notices as required, and that Walmart and Sam's exercised their options in a timely manner. Quarterfield argues that the court erred in its finding of breach based on its prior arguments that the Option Notices were not requirements at all, but rather privileges conferred upon Quarterfield to honor or rescind the option at its choosing. Apps.' Br. 26-28.

Quarterfield contends that the court "relied on the thin reed that there was a consequence for Quarterfield's failure to provide timely Option Notices as proof of

Quarterfield's breach of their obligation to do so." Apps.' Br. 27 (citing JA588)) internal quotation marks omitted). The parties' express, agreed language in the same section that confers the option in the first place is hardly a *"thin reed." See Credible Behav. Health,* 220 A.3d at 310–11 (2019) (quoting *Ocean Petroleum, Co.,* 5 A.3d 683, 691 (Md. 2010), in turn quoting *Pacific Indem. Co. v Interstate Fire & Cas. Co.,* 488 A.2d 486, 488 (Md. 1985) ("'Ascertaining the parties' intentions requires us to consider the plain language of the disputed contractual provisions "in context, which includes not only the text of the entire contract but also the contract's character, purpose, and 'the facts and circumstances of the parties at the time of execution.""'"). Reference to Quarterfield's failure to provide the Option Notices necessarily implies that the notices are an obligation, not a right within Quarterfield's sole discretion.

Were there any doubt on this score, it would be eliminated by the Lease's other references to "fail[ures]," all of which concern obligations, not discretionary rights that the party can choose to ignore. *See* JA42 & JA85, § 1 ("In the event Lessor *fails* to comply with (i), (ii) or (iii) above, Lessor shall be deemed in default under this Lease.") (emphasis added); JA46 & JA89, § 5(c) ("If Lessee *fails* to timely pay the Real Property Taxes, Lessor shall have the right to pay the Real Property Taxes (as well as any interest and/or penalties due to the taxing authority as a result of such non-payment), and all amounts so expended by Lessor shall be deemed to

be rent….") (emphasis added); JA47 & JA90, § 7 ("Lessee's *failure* to comply with any such laws and/or regulations") (emphasis added); JA50 & JA93, § 16 ("Lessee shall submit an invoice to the Lessor for the costs incurred by Lessee to cure a default of the Lessor, and if Lessor *fails* to pay the costs so invoiced, together with interest as hereinafter provided, within fifteen (15) days after receipt of an invoice for the same, Lessee shall have the right to deduct such costs, and interest thereon, from the amounts owed (including any future rent payments) by Lessee") (emphasis added); JA51 & JA93-94, § 17(a) (i) (providing that "Lessee's *failure* to pay any installment of rent and the continuance of the same for a period of forty-five (45) days after notice and demand therefore in writing have been made to Lessee, Lessee's *failure* to comply with any other covenant, agreement or obligation herein contained and the continuance of such failure for a period of sixty (60) days after receipt by Lessee from Lessor of notice in writing" constitute defaults) (emphasis added).

These "failures" denote breaches of obligations, not discretionary rights just as in the case of the Option Notices. This makes all the clearer what is already unambiguous in the option provision by itself—that Quarterfield was required to provide Option Notices. Just as none of the many other references to failure in the Lease confer rights on the party who fails to take action, neither did the parties intend to do so here. Nothing in the Purchase Option affords Quarterfield the discretion to simply disregard its obligation to provide the Option Notices.

Finally, the district court did not ignore the covenant of good faith and fair dealing as Quarterfield contends. *See* Apps.' Br. 27. Quarterfield correctly states that the covenant of good faith and fair dealing cannot override express terms of the contract and does not impose affirmative duties on a party beyond those expressed in the contract. *Id.* at 27-28. However, Quarterfield incorrectly suggests that the court's findings override express contractual provisions and impose duties on Quarterfield that are not expressed in the Lease. *Id.* at 28-29.

The district court did not attempt to impose some additional duty on Quarterfield not expressed in the Lease, but specifically held that Quarterfield's "refusal to issue the Option Notices was inconsistent with "its general obligations of good faith and fair dealing." JA588-589 (citing *Affable*, 2020 WL 1675920, at *4 (citing *Clancy v. King*, 954 A.2d 1092, 1106 (Md. 2008)). Not only did the court find that Quarterfield breached the expressed terms of the Purchase Option regarding the Option Notices, but that its refusal to send the notices also breached the covenant of good faith and fair dealing. By refusing to honor its obligation to provide the Option Notices, Quarterfield inappropriately thwarted Walmart's option rights. Its failures in this regard violate Maryland's duty of good faith and fair dealing, and the district court's decision in this regard was sound and consistent with Maryland law.

## III. The District Court Correctly Determined that the Option Term Is Measured from the Rent Commencement Date of the Lease.

Section 27 of the Lease defines the "Option Term" as the period of time "[f]rom the end of the tenth (10th) year of this Lease until the end of the eleventh (11th) year of this Lease."  JA58 & JA100.  Quarterfield claims that the eleventh year of the Lease runs from its Effective Date.  Apps.' Br. 30-31.

Section 27 does not expressly provide which year counts as the "first" of "this Lease."  The phrase "this Lease" is not expressly defined in a manner that would indicate its first year.  And the Option Term provision, in turn, does not provide that any "year of this Lease" is measured from the Lease's Effective Date, the Rent Commencement Date, or anything else.

Thus, the district court reasonably concluded that the Option Term is susceptible to more than one interpretation, and it considered extrinsic evidence to resolve the ambiguity.  JA592.[5]  The court held that "[w]hen the lease is read in its entirety, as it must be, the Court finds that the language is ambiguous as to when "this Lease" began for purposes of defining the one-year period when plaintiffs had an option to purchase the property." JA590. The court explained that "[i]t is unclear

---

[5] Quarterfield claims that the court considered extrinsic evidence to contradict the meaning of the Option Term, but in fact the court made abundantly clear that it relied on the extrinsic evidence presented to interpret the meaning of an ambiguous clause.  *Cf.* JA592 *with* Apps.' Br. 34 (quoting *Calomiris v. Woods,* 727 A.2d 358, 366-67 (Md. 1999)).

from the lease language whether the Option Term, defined as '[f]rom the end of the tenth (10th) year of this Lease until the end of the eleventh (11th) year of this Lease,' should be calculated using the Effective Date of the lease or the Rent Commencement Date of the lease. Faced with this ambiguity, the Court must consider extrinsic evidence to resolve it." JA592 (quoting JA58 & JA100).

Walmart presented ample evidence that the eleventh year of the Lease in the Option Term should be measured from the Rent Commencement Date. First, the parties exchanged letters of intent during lease negotiations in which "both sides proposed that the tenant 'shall have a one-time option to purchase the Property' and that 'Landlord will deliver notice to Tenant … prior to the end of the 10th anniversary of the Rent Commencement.'" JA592 (quoting JA189 & JA201). The court found that "[n]one of the letters of intent contemplated calculating the commencement of the 'one-time option to purchase' from the date the ground lease was signed." JA592. Equally, none of the letters of intent even mentioned the Effective Date, but they did define the Rent Commencement Date. JA189 & JA201. Quarterfield's contention that the letters of intent are different than the final Lease in unrelated respects does not somehow negate their explanatory value for the Option Term.

Next, the Short Form Lease executed by the parties also explains that for purposes of defining the Option Term, "[t]he Lease year shall begin on the Rent

Commencement Date, as defined in the Lease, which is on or before the date on which the Lessee first conducts regular business on the premises." JA593 & JA128. Acknowledging Quarterfield's contention that the Short Form Lease is strictly for recording purposes, the district court nevertheless found that it could be used to help explain the Option Term. JA593. The court succinctly summarized this point: "Although these documents state that the 'Short Form Lease shall be used only for recording purposes and shall not supersede, amend nor replace any covenants of the Lease,' they may serve as extrinsic evidence to define the terms in the lease." JA593 (quoting JA128) (citing *Emcor Grp., Inc. v. Great Am. Ins. Co.*, 2013 WL 1315029, at *9 (D. Md. Mar. 27, 2013) (noting that "'extrinsic sources' . . . that may be considered include 'an interpretation of the term employed by one of the parties before the dispute arose'") (quoting *Cole v. State Farm Mut. Ins. Co.*, 753 A.2d 533, 537 (Md. 2000)). In this respect, the Short Form Lease could not be clearer that "[t]he Lease year shall begin on the Rent Commencement Date."[6]

Finally, the court considered measurement of the eleventh year of the Lease from the Rent Commencement Date to be consistent with Quarterfield's testimony that it wanted to maximize the opportunity for rent before having to sell the

---

[6] Quarterfield's contention that this clause only states when a Lease year begins represents a distinction without a difference. The sentence immediately follows the sentence identifying the Option Term as falling "between the tenth (10th) and eleventh (11th) lease year. JA128. Obviously, since a lease year begins on the Rent Commencement Date, subsequent Lease years are also counted from that date.

properties. JA594. Measuring the eleventh year from the Rent Commencement Date extends the period in which the Quarterfield collected rent relative to measuring it from the Effective Date, which would include the three-year Study Period when only $100 per month in rent was paid.

Thus, measurement of the eleventh year of this Lease from the Rent Commencement Date is consistent with all of the extrinsic evidence presented. For all of these reasons, the district court correctly concluded that the eleventh year of the Lease should be calculated from the Rent Commencement Date not the Effective Date. None of this extrinsic evidence varies or contradicts the Option Term, but very clearly explains it for the court. No countervailing extrinsic evidence was presented that would support the contention that the eleventh year of the Lease should be counted from the signing date.

Even if the district court's decision had, contrary to fact, been incorrect, it becomes less critical since Quarterfield was obligated to provide the Option Notices and breached the Lease by not doing so. Quarterfield's breach suspended the commencement of the Option Term, and the court correctly found that Walmart properly exercised its option when Quarterfield affirmatively refused to send the notices. Therefore, the district court's conclusions regarding the Option Term should likewise be affirmed.

**IV.    The District Court Correctly Reimbursed Walmart and Sam's for Rent Paid After the Dates on Which They Should Have Owned Each Property.**

Quarterfield breached the Purchase Options in each Lease. But for that breach, Walmart would have owned its property by January 17, 2019, and Sam's would have owned its property by May 24, 2019. Their rent obligations would have ceased on those dates at the latest. Instead, because Quarterfield breached the Purchase Options, Walmart and Sam's were forced to continue paying rent on each property after they should have owned them. The amended complaint sought recovery of the rent paid after title to the properties should have been transferred to them. JA25-26.

The district court's award reimbursing Walmart and Sam's for rent after the aforementioned dates places them in the exact position they would have occupied if Quarterfield honored its obligations to convey the properties. *See Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 506 (4th Cir. 1986) (cited in Apps.' Br. 42). Quarterfield suggests, however, that the court's award "place[s] Walmart and Sam's in far better positions than they ever could have been had the purchase options been exercised and the properties been conveyed…." Apps.' Br. 42.

Quarterfield's argument overlooks the simple fact that Walmart and Sam's would have paid the purchase price for each property and obtained title to the properties thereby extinguishing their rent obligations. Walmart and Sam's stand ready to pay the agreed-upon purchase prices for each property (as adjusted to reflect

any credits recognized by the district court) when each is conveyed, and Quarterfield has never argued otherwise. Thus, reimbursement of the rent paid together with payment of the purchase price for each property places all parties in precisely the position they would have occupied absent Quarterfield's breaches.

By contrast, allowing Quarterfield to keep $2,153,446.48 in rent collectively paid by Walmart and Sam's after they should have owned the properties rewards Quarterfield with a double-recovery windfall for its own breaches. Indeed, it would reward Quarterfield with rent for a contract it breached. In short, Quarterfield would profit from its breaches by continuing to collect rent to which it was never entitled and would receive the purchase price for each property. Such a claim contradicts the principle of placing the *non-breaching party* in the place it would have occupied absent the breach. *See Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 506 (4th Cir. 1986) ("In Maryland, a party suffering a breach of contract is entitled to recover as damages the amount that would place him in the position he would have been in had the contract not been broken."), *cited in* Apps.' Br. 42. *See also National Micrographics Sys., Inc. v. OCE-Indus., Inc.,* 465 A.2d 862, 867 (Md. App. 1983), *cert. denied*, 470 A.2d 353 (Md. 1984) (acknowledging that "the innocent party in a breach of contract case is entitled to receive damages that would place him in the same position in which he would have been had the contract not been breached") (citing *Dialist Co. v. Pulford,* 399 A.2d 1374, 1379 (Md. App. 1979)). This is not a

case of free rent, but a case where Quarterfield seeks to obtain a double recovery from its own breach of contract, *i.e.,* both payment of rent after it breached and payment of the purchase price for each property. That claim violates the very law cited in its brief.

At bottom, and as set forth in *Johnson,* the district court's ruling put Walmart, as the non-breaching party, in the same position as it would have been had Quarterfield not breached the lease. The district court's Order should be affirmed.

## V.  Walmart Is Entitled to Attorneys' Fees and Costs Under the Expressed Terms of the Lease.

Counts I and II of the amended complaint sought a declaratory judgment enforcing Walmart's rights under the Purchase Option and specific performance of Quarterfield's obligation to transfer title to each property pursuant to the Purchase Option. *See* JA23-25. On October 31, 2019, Walmart moved for summary judgment seeking entry of that declaratory judgment and an order directing Quarterfield to specifically perform its obligations under the Purchase Option in each Lease. *See* JA8. On July 10, 2020, the district court entered an order and declaratory judgment granting Walmart's motion. The court also denied Quarterfield's cross-motion for summary judgment on the same issues. JA599. [7]

---

[7] On July 23, 2020, the district court amended its order to stay proceedings so Quarterfield an interlocutory appeal, which appeal was dismissed by this Court on November 10, 2022, as improvidently granted. JA601.

Finally, Walmart was granted leave to file a supplemental motion for summary judgment for damages under its breach-of-contract count in the amended complaint arising from the court's prior ruling that Quarterfield breached the Lease. That motion was granted in part and denied in part with respect to prejudgment interest only on April 5, 2024. JA662-673 & JA674. The district court's order also found in favor of Walmart for its attorneys' fees and costs under the expressed terms of the Lease. In this regard, Section 24 of each Lease provides that "[s]hould any legal action be commenced in connection with this Lease, the prevailing party in such action shall be entitled to recover, in addition to court costs, such amount as the court may adjudge as reasonable attorneys' fees." JA628-629.

No one disputes that Walmart was the prevailing party below. Quarterfield claims only "that this litigation is really about Walmart's and Sam's' asserted rights to purchase the properties and that, although the conditional purchase option is contained in the Leases, the purchase of the properties is governed by separate documents that were appended to the Leases, the Purchase Agreements." Apps.' Br. 48. Thus, Quarterfield claims that this litigation is really about a breach of the Purchase Agreements.

Quarterfield's argument was specifically addressed by the district court, which held that "the claims upon which Plaintiffs have prevailed relate to the leases,

and that Section 24(m) of the leases permits an award of reasonable attorney's fees and costs to Plaintiffs." JA671. In particular, the district court explained as follows:

> Plaintiffs' claims arise from Quarterfield's refusal to issue the notices required by the leases and its refusal to sell the properties to Plaintiffs after Plaintiffs sent notice of their intent to exercise the purchase options. In refusing to issue the notices and in refusing to sell the properties to Plaintiffs, Quarterfield breached Section 27 of its leases.

JA671.

Nothing in Walmart's amended complaint nor its motions for summary judgment concerned a breach of the Purchase Agreements. Everything concerned a breach of the Purchase Options in the Leases. Indeed, because Quarterfield breached the Leases, the parties never even signed the Purchase Agreements. So, Walmart's amended complaint did not seek any relief pursuant to the Purchase Agreements.

The fact that the Purchase Option in each Lease references draft Purchase Agreements (which are exhibits to the Leases) to be signed by the parties does not somehow transform an action for breach of the Lease into an action on the Purchase Agreement. The simple reality of this case is that Quarterfield breached the Purchase Option in the Lease and this entire litigation deals with that issue. Walmart prevailed on its claims. If this Court affirms that judgment, Walmart is entitled to its attorneys' fees and costs under the express to terms of the Lease.

# CONCLUSION

For these reasons, Appellees Walmart Real Estate Business Trust and Sam's Real Estate Business Trust respectfully request that the Court affirm the district court's decisions and remand for further proceedings.

Respectfully submitted,

_/s/ Donald A. Rea_
Donald A. Rea
Law Offices of Donald A. Rea LLC
2316 Cavesdale Road
Owings Mills, Maryland 21117
(410) 905-4656
don@donrealaw.com

*Counsel for Appellees Walmart Real Estate Business Trust and Sam's Real Estate Business Trust*

September 3, 2024

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I certify that this Response Brief of Appellee is 14 point, Times New Roman font and contains 8,906 words excluding parts of the document exempted by Rule 32(a)(7)(B)(iii).

*/s/ Donald A. Rea*

Donald A. Rea
Law Offices of Donald A. Rea LLC
2316 Cavesdale Road
Owings Mills, Maryland 21117
(410) 905-4656
don@donrealaw.com

*Counsel for Appellees Walmart Real*
*Estate Business Trust and Sam's*
*Real Estate Business Trust*

September 3, 2024

## CERTIFICATE OF SERVICE

I certify that on this  3rd  day of September, 2024, the Brief of Appellees was

served on all parties or their counsel of record through the CM/ECF system.

*/s/ Donald A. Rea*
Donald A. Rea
Law Offices of Donald A. Rea LLC
2316 Cavesdale Road
Owings Mills, Maryland 21117
(410) 905-4656
don@donrealaw.com

*Counsel for Appellees Walmart Real*
*Estate Business Trust and Sam's*
*Real Estate Business Trust*
